# EXHIBIT A

Page 1

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

      KENNETH E. HARE,                )
 4                                    )
                     Plaintiff,       )
 5                                    )
                -vs-                   )  No. 1:19-cv-00692
 6                                    )
      PROPUBLICA ILLINOIS, and        )
 7    PROPUBLICA,                     )
                                      )
 8                   Defendants.      )

 9

10        Deposition of KENNETH E. HARE, taken before

11   LISA A. BORDEN, C.S.R., and Notary Public, pursuant

12   to the Federal Rules of Civil Procedure for the

13   United States Courts pertaining to the taking of

14   depositions for the purpose of discovery, at Suite

15   800, One North Franklin, Chicago, Illinois,

16   commencing at 10:00 a.m., on the 6th day of January,

17   2020.

18

19

20

21

22

23

24
```

Page 2

```
1  A P P E A R A N C E S:
2      LAW OFFICE OF JILL M. WILLIS by
       MS. JILL M. WILLIS
3      3628 South King Drive
       Chicago, Illinois  60653
4      (847) 826-5284
       jillwillis.law@gmail.com
5
           on behalf of the Plaintiff;
6
7      GORDON REES SCULLY MANSUKHANI, LLP by
       MR. JONATHAN B. BLAKLEY
8      One North Franklin Street
       Suite 800
9      Chicago, Illinois  60606
       (312) 980-6768
10     jblakley@grsm.com
11         on behalf of the Defendants;
12
    ALSO PRESENT:  Jeremy Kutner.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              DEPOSITION OF
2            KENNETH E. HARE
3          taken January 6, 2020
4
5  EXAMINATION BY              PAGE
6  Mr. Blakley                 5, 138
7  Ms. Willis                  116, 141
8
9              EXHIBITS
10                            PAGE
11  EXHIBIT 1                  13
    (Plaintiff's Response to
12  Defendants' Interrogatories)
13  EXHIBIT 2                  14
    (Plaintiff's Response to Defendants'
14  Request for Production of Documents)
15  EXHIBIT 3                  15
    (Plaintiff's Response to Defendants'
16  Supplemental Interrogatories and
    Requests to Produce)
17
    EXHIBIT 4                  16
18  (September 16, 2019 Letter to
    Ms. Willis)
19
    EXHIBIT 5                  16
20  (September 26, 2019 Letter to
    Mr. Blakley)
21
    EXHIBIT 6                  17
22  (EEOC Charge of Discrimination)
23  EXHIBIT 7                  18
    (EEOC Dismissal and Notice of Rights)
24
```

Page 4

```
1                             PAGE
2   EXHIBIT 8                  22
    (Kenneth Hare Resume)
3
    EXHIBIT 9                  45
4   (ProPublica Job Posting)
5   EXHIBIT 10                 50
    (April 25, 2017 E-mails)
6
    EXHIBIT 11                 52
7   (April 25 2017 E-mail to
    Louise Kiernan)
8
    EXHIBIT 12                 69
9   (ProPublica Job Posting)
10  EXHIBIT 13                 72
    (Screendoor Documents)
11
    EXHIBIT 14                 73
12  (Reporting Memo)
13  EXHIBIT 15                 74
    (Blog Posts)
14
    EXHIBIT 16                 102
15  (April 16, 2018 Letter to Greg Mucha)
16  EXHIBIT 17                 109
    (April 24, 2017 Letter to
17  Louise Kiernan)
18  EXHIBIT 18                 110
    (Chicago Defender Article)
19
    EXHIBIT 19                 111
20  (Chicago Reporter Article)
21  EXHIBIT 20                 111
    (Mother Jones Article)
22
23
24
```

Page 5

```
1         (Witness sworn.)
2            KENNETH E. HARE,
3  called as a witness herein, having been first duly
4  sworn, was examined upon oral interrogatories and
5  testified as follows:
6              EXAMINATION
7  BY MR. BLAKLEY:
8     Q   Can you please state and spell your name for
9  the record, sir.
10    A   First name is Kenneth, K-e-n-n-e-t-h, middle
11  name is Eric, last name is Hare, capital H-a-r-e like
12  the rabbit.
13    Q   Let the record reflect that this is the
14  deposition of Kenneth Eric Hare taken pursuant to
15  notice, agreement of the parties and all applicable
16  federal court rules.  This deposition is also taken
17  pursuant to all applicable local rules of the
18  Northern District of Illinois.
19        Mr. Hare, as I introduced myself off of
20  the record, my name is Jonathan Blakley.  I represent
21  ProPublica Incorporated in a lawsuit that you filed
22  against it in federal court that's pending in the
23  Northern District of Illinois.  I'll be asking you
24  some questions today pertinent to the lawsuit and I
```

Page 6

1  imagine your counsel will have some questions for you
2  as well.
3        My first question I think is pretty
4  straightforward.  Have you ever provided deposition
5  testimony before?
6    A   No.
7    Q   Okay.  And I'm sure your counsel went over
8  some of the ground rules.  I'm going to go over them
9  again today just to make sure things go smoothly,
10  okay?
11    A   Sure.
12    Q   First, as you see we have a court reporter to
13  my left, Lisa.  She's taking down everything that's
14  said in the room this morning, so there's a few
15  things we should do to make her life easier and to
16  make sure that we have a transcript that's legible at
17  the end of this, okay?  Is that a yes?
18    A   Yes.
19    Q   That's actually the first rule.  It's
20  difficult for Lisa to take down nods of the head,
21  shrugs of the shoulder, things like that.  So when
22  you're answering questions, please try to use words
23  and answer them verbally, okay?
24    A   Sure.

Page 7

1    Q   Secondly, it's really difficult for Lisa to
2  take down two people speaking at the same time, so if
3  you could wait until I get my question out in full
4  even if it's painfully obvious where I'm going, I'd
5  appreciate that, and I'll do you the same courtesy.
6  I'll wait until you've finished answering your
7  question before I ask my next question, is that okay?
8    A   Sure.
9    Q   If you don't understand a question I ask,
10  please let me know.  Sometimes as attorneys we're not
11  always as articulate as we'd like to be.  So if I ask
12  you something and you do not understand it, let me
13  know.  I'll be happy to rephrase it for you, okay?
14    A   Absolutely.
15    Q   But if you do answer a question, I'm going to
16  assume that you understood it in the way I intended
17  it to be understood, okay?
18    A   Could you repeat that.
19    Q   Sure.
20        I want to emphasize to you that if you
21  don't tell me that you did not understand a question
22  that I ask that I'm going to assume that you
23  understood it the way I intended it to be understood,
24  okay?

Page 8

1    A   Okay.
2    Q   Lastly, we can take a break at almost any
3  time.  I don't think we'll be here terribly long this
4  morning, but we can take a break.  The only caveat is
5  that we can't take a break if there's a question
6  pending.  So if I ask you a question, you have to
7  answer that question before we go off the record,
8  okay?
9    A   Sure.
10    Q   Are you on any medication today?
11    A   Yes, I am.
12    Q   What medications are you on today?
13    A   I believe it's -- it's in the -- it's part of
14  my record.  It's Serta something, Sertraline or --
15    Q   Let me ask you this.
16        Is this a medication that affects your
17  mood?
18    A   Oh, definitely.  I'm sorry, this medication
19  has a ton, a ton of side effects.
20    Q   Okay.
21    A   And I've experienced all of them -- well,
22  most of them.
23    Q   Does it affect your memory?
24    A   Yes, it does.

Page 9

1    Q   Okay.  How does it affect your memory, sir?
2    A   Memory loss.
3    Q   And how does it affect your mood?
4    A   It affects my mood after I take the
5  medication, it like slows me down a little bit and I
6  can experience -- I have experienced hallucinations
7  at times and loss of appetite.
8    Q   Can you describe these hallucinations for me,
9  please.
10    A   Like the room -- there was a time after I
11  took the medication like the room like the walls were
12  kind of moving around and the floor was kind of
13  shifting underneath my feet.  It was kind of like
14  almost like psychotropic in a way.
15    Q   How often have you experienced hallucinations
16  after taking this medication?
17    A   I've experienced that like about three or
18  four times.
19    Q   And when did you first start taking the
20  medication?
21    A   It was prescribed by my doctor I believe it
22  was in August of 2019.
23    Q   Okay.  Let me --
24    A   August or September, one of the two.

Page 10

1    Q   Okay.  You've mentioned that you're on this
2    medication today.  Do you believe that this
3    medication affects your ability to answer questions
4    truthfully this morning?
5        A   I don't know.
6        Q   Is there any reason you can give me why you
7    would not be able to give truthful and accurate
8    testimony?
9        A   Well, I'm going to try my best but, you know,
10   the medication has definitely had a great impact on
11   me, Jonathan.
12       Q   The reason I ask these questions is because
13   this is the only time I am able to talk to you, and I
14   want to ensure that the answers you give me today are
15   reliable, and I don't want to have a situation where
16   we have a deposition and we have a transcript and
17   then you later read the transcript and you tell me
18   this isn't what I meant to say.  So I need you to
19   confirm that the answers today will be truthful to
20   the best of your ability.
21       A   To the best of my ability I will do my best
22   and that's all I can say.
23       Q   All right.
24       A   I'll do my best.  I'm on psychotropic

Page 11

1    medication and it has, man, it's changed my life.
2    This situation has changed my life.
3        Q   I understand, but I also I only get one
4    opportunity to speak with you.
5        A   Sure.
6        Q   And so you need to be bound by the answers
7    you give today.  That's why we have a court reporter
8    administer an oath, do you understand that?
9        A   Yeah, I understand it to the best of my
10   ability.
11       Q   Have you reviewed any documents in
12   preparation for the deposition today?
13       A   Yes.
14       Q   Okay.  What did you review?
15       A   I reviewed the documents that were submitted
16   on my behalf.
17       Q   And you mentioned documents submitted on your
18   behalf.  What exactly did you review today in
19   preparation for the deposition this morning?
20       A   My interrogatories and the requests for
21   production.
22       Q   When you say your interrogatories, do you
23   mean your answers to interrogatories propounded upon
24   you?

Page 12

1        A   That is correct.
2        Q   And when you say responses to production
3    requests, do you mean your responses to our request
4    for production?
5        A   That is correct.
6        Q   Did you review any medical records?
7        A   No, I don't have medical records.
8        Q   Did you review any employment records?
9        A   No, I didn't review employment records.
10       Q   Did you review any tax or financial records?
11       A   No, I didn't.
12       Q   Did you meet with an attorney in preparation
13   for the deposition this morning?
14       A   We spoke over the phone.
15       Q   How many times did you meet with your
16   attorney in preparation for the deposition this
17   morning?
18       A   In preparation.  We haven't met in person.
19   We talked about this over the phone.
20       Q   Correct.  How many times did you speak on the
21   phone with your attorney in preparation for the
22   deposition this morning?
23       A   I think we spoke about twice, two or three
24   times.

Page 13

1        Q   Okay.  Each time over the phone?
2        A   Yes.
3        Q   For how long each time?
4        A   Like about 20 minutes, 15, 20 minutes.
5        Q   Did you speak with anyone other than your
6    attorney about your deposition this morning?
7        A   No.
8        MR. BLAKLEY:  What I'd like to do is mark an
9    exhibit now, sir, and we're going to mark a couple, a
10   few in a row.
11              (Whereupon Deposition Exhibit 1 was marked
12               for identification.)
13   BY MR. BLAKLEY:
14       Q   Mr. Hare, I'm handing you what's been marked
15   as Exhibit 1.  This document is titled Plaintiff's
16   Response To Defendant's Interrogatories.  Do you see
17   that title in the document, sir?
18       A   Yes, I do.
19       Q   When you said you reviewed documents prior to
20   the deposition in preparation for the deposition, you
21   referred to answers to interrogatories.  Is Exhibit 1
22   the document you were referring to?
23       A   Yeah, that is correct.
24       Q   So I imagine you recognize the document then?

Page 14

```
 1     A   Oh, yeah.
 2     Q   And on the last page of the document,
 3   Page 12, there's a signature that appears at the
 4   bottom.  Is that your signature?
 5     A   That is correct.
 6     Q   So you reviewed all the information contained
 7   in this document, correct?
 8     A   Yeah, pretty much.
 9     Q   And all of it is true and correct to the best
10   of your knowledge?
11     A   Yes.
12     MR. BLAKLEY:  Let's mark another exhibit now.
13         (Whereupon Deposition Exhibit 2 was marked
14          for identification.)
15   BY MR. BLAKLEY:
16     Q   Mr. Hare, what's just been handed to you and
17   marked as Exhibit 2 is a document entitled
18   Plaintiff's Response to Defendant's Request for
19   Production of Documents.  Do you see that title in
20   the document, sir?
21     A   Yes, I do.
22     Q   And do you see your signature on Page 6?
23     A   Yes, I do.
24     Q   So you reviewed the information in Exhibit 2
```

Page 15

```
 1   prior to it being submitted to the parties, correct?
 2   That's correct?
 3     A   Yeah, that is correct.
 4     Q   And it's true and accurate to the best of
 5   your knowledge?
 6     A   Yes, that is correct.
 7     MR. BLAKLEY:  We'll mark another exhibit here.
 8         (Whereupon Deposition Exhibit 3 was marked
 9          for identification.)
10   BY MR. BLAKLEY:
11     Q   Mr. Hare, what has been handed to you and
12   marked as Exhibit 3 is a document entitled
13   Plaintiff's Response to Defendant's Supplemental
14   Interrogatories and Requests to Produce.  Do you see
15   that title on this document, sir?
16     A   Yes, I do.
17     Q   And did you review this document in
18   preparation for the deposition this morning?
19     A   Let me check, hold on.  Yes, I did.
20     Q   Okay.  Your signature appears on the second
21   page, is that right?
22     A   That is correct.
23     Q   So again, you reviewed the information in
24   this document before it was submitted to the parties?
```

Page 16

```
 1     A   What parties?
 2     Q   The parties to the lawsuit.
 3     A   Yes.
 4     Q   And it's true and accurate, correct?
 5     A   Yeah.
 6         (Whereupon Deposition Exhibit 4 was marked
 7          for identification.)
 8   BY MR. BLAKLEY:
 9     Q   Mr. Hare, what's just been handed to you and
10   marked as Exhibit 4 is a letter that I authored to
11   your counsel dated September 16th, 2019, and in that
12   letter I asked that you verify certain facts about
13   your employment and earnings history and I also
14   addressed questions raised by your counsel regarding
15   written discovery.
16         Do you recognize this document?
17     A   Yes, I do.
18     Q   And you authored a response to this, is that
19   right?
20     A   I believe I did.
21     MR. BLAKLEY:  I'm going to mark something as
22   Exhibit 5 now.
23         (Whereupon Deposition Exhibit 5 was marked
24          for identification.)
```

Page 17

```
 1   BY MR. BLAKLEY:
 2     Q   Mr. Hare, what's been marked as Exhibit 5 and
 3   just handed to you is a document addressed to me as
 4   counsel for ProPublica.
 5         This is a letter that you authored in
 6   response to my September 16, 2019 letter to your
 7   attorney, correct?
 8     A   Yeah, that is correct.
 9     Q   Now, prior to initiating this case in federal
10   court, you filed a charge of discrimination against
11   ProPublica with the EEOC, is that right?
12     A   Yes, that is correct.
13         (Whereupon Deposition Exhibit 6 was marked
14          for identification.)
15   BY MR. BLAKLEY:
16     Q   Now, what's been marked as Exhibit 6 and
17   handed to you are two pages of EEOC charge
18   documentation.  The first page is entitled Charge of
19   Discrimination, do you see that, sir?
20     A   Yeah, I do.
21     Q   Okay.  And it indicates that it was digitally
22   signed by you on February 6, 2018, do you see that at
23   the bottom left-hand corner of the first page?
24     A   Yeah, I do.
```

Page 18

1    Q    And at the top right-hand corner of the
2   second page there's a date of February 6th, 2018,
3   correct?
4    A    Yeah, that is correct.
5    Q    So you filed your EEOC charge documents in
6   February of 2018, true?
7    A    Yeah.
8    Q    And the charge was investigated by the EEOC,
9   correct?
10   A    Yes.
11   Q    And it was dismissed by the EEOC, isn't that
12  right?
13   A    Dismissed?
14   Q    Yes.
15   A    Yeah, that is correct.
16   MR. BLAKLEY:  Just for the record, we'll mark the
17  EEOC's letter of dismissal and notice of rights as
18  Exhibit 7.
19        (Whereupon Deposition Exhibit 7 was marked
20         for identification.)
21  BY MR. BLAKLEY:
22   Q    Mr. Hare, what's been marked as Exhibit 7 and
23  just handed to you is a document entitled Dismissal
24  And Notice Of Rights, is that correct?

Page 19

1    A    That is correct.
2    Q    And it's dated October 31st, 2018, bottom
3   right-hand corner?
4    A    That is correct.
5    Q    Now, were you represented by counsel during
6   the EEOC investigation?
7    A    No.
8    Q    When did you first retain an attorney to
9   pursue this matter in federal court?
10   A    After they gave me the right to sue letter.
11   Q    And who did you retain?
12   A    Attorney Jill Willis.
13   Q    And you said after, you retained her after
14  you received the right to sue letter.  What date did
15  you retain Ms. Willis?
16   A    That's a good question.  Off the top of my
17  head I don't recall.
18   Q    Okay.  Was it in the calendar year of 2018?
19   A    I believe, yeah, I think so.
20   Q    Was it in November of 2018?
21   A    November or December.
22   Q    What's your date of birth, sir?
23   A    ██████████████
24   Q    And what year?

Page 20

1    A    '64.
2    Q    What's your current address?
3    A    704 East 50th Place.
4    Q    That's here in Chicago?
5    A    Yeah, that is correct, and 60615 is the zip.
6    Q    How long have you lived at that address?
7    A    1997.
8    Q    Before residing at the East 50th Place
9   address, where did you live immediately before that?
10   A    I was on North Wells.
11   Q    Do you remember your address?
12   A    No, but the building is torn down.  It was in
13  a high-rise.
14   Q    If you had to explain what neighborhood you
15  lived in at that time, how would you --
16   A    Old Town.
17   Q    Old Town, okay.  And how long did you live in
18  Old Town?
19   MS. WILLIS:  Objection, relevancy.
20   MR. BLAKLEY:  Noted.
21  BY MR. BLAKLEY:
22   Q    How long did you live in the Old Town
23  residence?
24   A    I don't know, maybe a year or two.

Page 21

1    Q    Before you lived in the Old Town residence,
2   where did you live?
3    MS. WILLIS:  Continuing objection.
4    THE WITNESS:  I don't -- I don't remember.
5   BY MR. BLAKLEY:
6    Q    Are you married, sir?
7    A    No.
8    Q    Have you ever been married?
9    A    No.
10   Q    Do you have any children?
11   A    No.
12   Q    Any siblings?
13   A    Yeah, there are eight of us.
14   Q    Did you ever discuss this case with any of
15  your siblings?
16   A    No.
17   Q    Have you filed -- well, you spoke about the
18  EEOC claim that you filed.  Have you filed any other
19  lawsuits or claims at any time?
20   A    Have I filed any other lawsuits or claims?
21   Q    Yes.
22   A    I don't think so.
23   Q    Have you ever provided trial testimony at any
24  time?

Page 22

1   A   Trial testimony?  You mean have I been a
2   witness?
3   Q   Yes.  Well, let me rephrase the question.
4       Have you ever provided testimony in court?
5   A   No, I don't think so.
6   Q   You mentioned you having been a witness --
7   strike that.
8       You asked me when I asked my question
9   whether I meant whether you had been a witness or
10  not, so I'm going to follow up on that.
11      Have you been a witness in any type of
12  lawsuit before?
13  A   A witness?
14  Q   Yes.
15  A   No.
16  Q   Okay.  Let's mark another exhibit.
17      Well, before we do that I'll ask you one
18  more question, and please don't be offended.  I ask
19  this of everyone.
20      Have you ever been convicted of a felony
21  or a crime of dishonesty?
22  A   No.
23  MR. BLAKLEY:  Let's mark another exhibit now.
24      (Whereupon Deposition Exhibit 8 was marked

Page 23

1       for identification.)
2   BY MR. BLAKLEY:
3   Q   Mr. Hare, the court reporter just handed you
4   what's been marked as Exhibit 8.  Do you recognize
5   this document?
6   A   Yes, I do.
7   Q   It's your resume, is that correct?
8   A   Uh-huh, that's correct.
9   Q   And do you recall creating this resume?
10  A   Yes, I do.
11  Q   When did you author it?
12  A   I did this around the time that I had applied
13  to ProPublica, yeah, because this one was for them.
14  Q   Please take a minute to review it.  Does the
15  information appear accurate?
16  A   Yes.
17  Q   Now, under the professional summary section
18  it notes that, this language says, quote, reporter
19  looking to join ProPublica's Chicago investigative
20  team, do you see that?
21  A   Uh-huh.
22  Q   So did you author this specifically for
23  submission to ProPublica?
24  A   Yeah, I did.

Page 24

1   Q   The second page notes that you have a high
2   school diploma from Steinmetz High School, do you see
3   that?
4   A   Yes, I do.
5   Q   Now, when you wrote high school diploma here,
6   were you referring to a GED?
7   A   Yes.
8   Q   And you obtained that when you were about 22,
9   correct?
10  A   I don't remember the age, but it was -- it
11  was after Steinmetz.
12  Q   You said after Steinmetz.  What do you mean?
13  A   Well, they had blocked me from graduating.
14  Q   Okay.  Explain that further when you say they
15  blocked you from graduating.
16  A   Well, I was part of a group of students that
17  had participated in this integration process of
18  integrating that high school, and they did not like
19  black people at all.
20  Q   When you say they did not like black people,
21  what do you mean?
22  A   They would tell us nigger go home.  There
23  were always riots.  They would gather us up in the
24  auditorium and put us on a bus so that we could

Page 25

1   safely be escorted out of the neighborhood, those
2   types of things.
3   Q   When you say they, who are you referring to
4   at Steinmetz?
5   A   The administration.  The students would tell
6   us nigger go home.  The administration would tell us,
7   I mean, they would gather us up in the auditorium if
8   there was a threat of a racial riot and put us on the
9   bus to escort us home.  So I had all of my credits
10  except for one in my senior year, and they blocked me
11  and refused to give it to me.
12  Q   When you say they you're referring to the
13  administration at Steinmetz?
14  A   Yes, the administration, that is correct.
15  Q   Did you attend any other high schools before
16  attending Steinmetz?
17  A   No.
18  Q   When did you first begin attending Steinmetz?
19  A   I believe it was in '79, 1979.
20  Q   After obtaining your GED from Steinmetz, did
21  you receive any other formal education?
22  A   Yeah, I was in college.  I had about a year
23  and a half of college, college credits.
24  Q   Where did you attend college?

Page 26

1    A    It was at the Loop which was -- today it's
2  known as Harold Washington.
3    Q    When did you begin taking courses at Harold
4  Washington?
5    A    In my senior year of high school, so I was in
6  high school in the daytime and college in the
7  evening.
8    Q    So at Harold Washington they permitted you to
9  start taking college courses without having finished
10  high school?
11    A    That is correct.
12    Q    Was this unusual?
13    A    Yeah, I think it was.
14    Q    What reason did they give you for permitting
15  you to do that?
16    A    It was a requirement of Social Security.
17    Q    Can you explain that further, please.
18    A    I don't know.  It was -- it had something to
19  do with Social Security.
20    Q    Okay.  So you said one-and-a-half years at
21  Harold Washington?
22    A    Roughly about one-and-a-half years.  It's
23  been so long I don't recall, but it's about
24  one-and-a-half years.

Page 27

1    Q    How many courses did you take at Harold
2  Washington?
3    A    I took a full load.
4    Q    When you say a full load, how many courses
5  would that be?
6    A    Probably like about six or seven.
7    Q    What did you study there?
8    A    I don't recall off the top, but it
9  was general.  They were general classes.
10    Q    Can you be any more specific other than
11  general classes?
12    A    No.
13    Q    Now, I notice that this doesn't appear on
14  your resume.  Is there a reason why you didn't
15  include it?
16    A    Because I didn't complete it.
17    Q    And why didn't you complete your time at --
18  strike that.
19        Why didn't you complete your education at
20  Harold Washington?
21    A    I dropped out.
22    Q    Why did you drop out?
23    A    I was up under a tremendous amount of stress.
24  I was only 17 at the time, 17 or 18 years old at the

Page 28

1  time.  I didn't have any mentors and it was
2  completely overwhelming and nobody wanted to help me.
3    Q    Have you ever received any formal journalism
4  training?
5    A    No.
6    Q    No formal journalism education, correct?
7    A    That is correct.
8    Q    Still focusing on Exhibit 8, you've listed
9  some employment history that begins in 2001 on the
10  bottom of the first page and going on to the second
11  page, do you see that?
12    A    Yeah, it is correct.
13    Q    So what did you do for a living between 1986
14  and 2001?  Can you please walk me through that
15  process.
16    A    1986 and 2001?
17    Q    Right.
18    A    In '86 I was a hairdresser.
19    Q    Where did you work as a hairdresser?
20    A    Oh, let's see, I worked at there was a salon
21  on the north side called Milio's, there was Vidal
22  Sassoon, there was Louis Licari, Bumble and Bumble.
23    Q    Any others you can recall?
24    A    No, just those four.  Four of the main, yeah,

Page 29

1  four of the main ones.
2    Q    And how long did you work as a hairdresser?
3    A    Up until I started real estate.
4    Q    Okay.  So you worked as a hairdresser from
5  1986 to 2001?
6    A    Yeah, basically.
7    Q    Okay.  Did you hold any other employment
8  during that time period, 1986 to 2001?
9    A    No, not to my recollection.
10    Q    And when I asked you whether you worked as a
11  hairdresser during that time period you said
12  basically.  I want to follow up on that.
13        When you said basically, what did you
14  mean?
15    A    Basically that's what I did.
16    Q    Okay.  No other employment, correct?
17    A    No other employment.
18    Q    Were there gaps in your employment from 1986
19  to 2001 as a hairdresser?
20    A    I don't recall because I don't have that
21  history exactly in front of me, but those were
22  the salons that I had worked at.
23    Q    In 2001 your resume notes that you began
24  working as a real estate consultant at P.I. Chicago,

Page 30

1   Incorporated?
2       A   Yes, that is correct.
3       Q   What is P.I. Chicago, Incorporated?
4       A   That was a company, a small business that I
5   formed.
6       Q   When did you form that business?
7       A   I believe it was in 2001.
8       Q   And what prompted you to form that business?
9   What was the motivation for it?
10      A   Well, I had did some community work with
11  ACORN Housing, and it was with real estate mortgage
12  counseling and that's what -- so that's what inspired
13  me.
14      Q   You mentioned community work with ACORN
15  Housing.  Was this a paid position?
16      A   Yes, it was.
17      Q   Okay.  So how long did you work with ACORN
18  Housing?
19      A   I worked at ACORN for two-and-a-half years.
20      Q   And forgive me, what is ACORN Housing?  Can
21  you describe that for the record.
22      A   That was the Association of Community
23  Organization for Reform Now.
24      Q   So ACORN is an acronym?

Page 31

1       A   Yeah.
2       Q   And what did the organization do?
3       A   Community organizing, like where Obama where
4   he cut his chops, it's the same organization.
5       Q   Okay.  And what was your position with ACORN?
6       A   I did counseling.
7       Q   Can you expand on that.  When you say
8   counseling what do you mean?
9       A   Like counseling first-time home buyers.
10      Q   And you did that for two-and-a-half years?
11      A   Yeah, I did that for about two-and-a-half
12  years.
13      Q   Do you remember which years?
14      A   It was before -- I think it was '95, 1995.
15      Q   So about 1995 to 1998?
16      A   No, 1995 to 1997.
17      Q   Okay.  So your work with ACORN inspired you
18  to start P.I. Chicago, Inc., correct?
19      A   Yeah, that is correct.
20      Q   And what does P.I. stand for?
21      A   It was a Greek name, Poratio Ishkas
22  (phonetic).  Don't ask.  It just came to me.
23      Q   Okay.  What does Poratio Ishkas mean?
24      A   What does it mean?

Page 32

1       Q   What does it mean?
2       A   It was a Greek term.  It meant the portion --
3   the portion -- it means more than enough.
4   Specifically referring to the portion after you've
5   helped everybody else, whatever is left over is more
6   than enough to meet your needs, so that's what it
7   meant.
8       Q   And what did P.I. Chicago, Inc., what did the
9   business do?
10      A   Real estate investing and consulting.
11      Q   And it's a business that you started
12  yourself, correct?
13      A   Yeah, that is correct.
14      Q   Did you ever have any employees?
15      A   No.
16      Q   Your resume on Page 2 notes that you, quote,
17  negotiated, facilitated and managed real estate
18  transactions including buying and flipping
19  properties, do you see that?
20      A   Yep.
21      Q   Did you undergo any special training prior to
22  engaging in this consultation work?
23      A   No.
24      Q   Did you obtain any certifications?

Page 33

1       A   No.
2       Q   Now, your resume notes that you operated P.I.
3   Chicago, Inc. from June 2001 to June 2007, do you see
4   that?
5       A   Yes.
6       Q   Why did you stop working as a consultant at
7   your company P.I. Chicago, Inc.?
8       A   Well, that's obvious.  The market was
9   crashing.
10      Q   So the next -- strike that.
11          The next position listed on your resume is
12  legal assistant/office administrator with the Glover
13  Law Office, do you see that?
14      A   Yes.
15      Q   You began working there in February of 2010,
16  correct?
17      A   Yeah, that's correct.
18      Q   So what did you do for a living between
19  June 2007 and February 2010?
20      A   2007 to 2010?  I don't recall.
21      Q   Okay.  You can give me no information as to
22  what you did for a living for that time period,
23  correct?
24      A   I don't remember.  I don't recall.

Page 34

1    Q   You began working as a legal assistant at
2  Glover Law Office in February of 2010, that's what's
3  written here, correct?
4    A   Yes.
5    Q   That was located at 21117 Jim Johnson Road in
6  Steger, Illinois, true?
7    A   Yes.
8    Q   What type of practice did the lawyers engage
9  in at Glover Law Office?
10   A   She did family, she did foreclosure defense,
11 some estate, I believe.
12   Q   And you say she.  Who are you referring to
13 when you say she?
14   A   She was the lady that I worked for, the
15 attorney that I worked for.
16   Q   Okay.  What's her name?
17   A   LaOuida Glover.
18   Q   So it's Glover Law Office?
19   A   Glover Law Office, yeah.
20   Q   What did you do -- strike that.
21       It says you performed paralegal duties
22 including interviewing clients for possible legal
23 representation.  That's what's written in your
24 resume, correct?

Page 35

1    A   That is correct.
2    Q   And you worked there until November of 2015?
3    A   Yeah, that is correct.
4    Q   So why did you leave Glover Law Office in
5  November of 2015?
6    A   She was getting ready to retire and winding
7  down the business.
8    Q   And was Glover Law Office based out of
9  Ms. Glover's home?
10   A   Yes, it was.
11   Q   So after you left Glover Law Office you began
12 working at the Defender, correct?
13   A   Yeah, that is true.
14   Q   And this was your first job in the journalism
15 field, true?
16   A   That is correct.
17   Q   What did you do for work between
18 November 2015 and January of -- strike that.
19       You began working at the Defender while
20 you were still working at Glover Law Office?
21   A   Yeah, Glover Law was like part time.
22   Q   Okay.  So your resume notes that you began
23 working at the Defender in January of 2015, that's
24 correct?

Page 36

1    A   Yeah, that is correct.
2    Q   You noted your title as investigative and
3  consumer reporter, do you see that?
4    A   Yes.
5    Q   How would you define investigative reporter?
6    A   How would I define it?
7    Q   Right.
8    A   I reported, investigated stories that were
9  assigned to me by my editor Kai El Zabar.
10   Q   Okay.  So to be an investigative reporter you
11 just need to be investigating stories, that's your
12 understanding?
13   A   I don't understand your question.
14   Q   Sure.
15       I want to know what you mean when you
16 write investigative and consumer reporter.  So when
17 you noted that you were an investigative reporter,
18 what made you an investigative reporter is that you
19 investigated stories?
20   A   Yeah, I investigated stories and leads that
21 were assigned to me by my editor at that time Kai El
22 Zabar.
23   Q   What made you a consumer reporter?
24   A   What made me a consumer reporter, Jonathan,

Page 37

1  is if a consumer called in with an issue that they
2  were having with a company or a corporation or with a
3  landlord then I would look into their allegations to
4  see what their rights were, if they were being
5  violated or things of that nature.
6    Q   So are the terms investigative reporter and
7  consumer reporter distinct or are they essentially
8  the same thing?
9    A   They're different.
10   Q   They're different, okay.
11   A   I would say they're different.
12   Q   How are they different?
13   A   Well, consumers are everyday consumers like
14 if you go in the store and you buy a product, that
15 would make a consumer of that particular product or
16 service whereas an investigative story would be
17 different.  It wouldn't necessarily be about consumer
18 products.  It could be about politics.  It could be
19 about discrimination.
20   Q   I see.  So when you wrote consumer reporter
21 here, you're talking about your work when you were
22 discussing consumer products?
23   A   Yeah, consumers, products consumed by
24 consumers.

Page 38

1    Q   It says on your resume you wrote and produced
2  over 250 stories for print and digital media
3  including the groundbreaking three-part series about
4  the FOP contract and the difficulty disciplining
5  officers accused of excessive use of force, do you
6  see that?
7    A   Yes, I do.
8    Q   When you say you wrote and produced stories,
9  what do you mean by that?
10    A   I wrote over 250 stories.
11    Q   Is there a difference between writing a story
12  and producing a story?
13    A   The terms could be used interchangeably,
14  writing the story and producing the story.
15    Q   So they're the same thing?
16    A   I would use them interchangeably.
17    Q   Okay.  Is there a story that you could
18  produce and not write?  Do you understand what I'm
19  asking you?
20    A   No, I don't.
21    Q   So you said write and produce.  Are there any
22  stories that you produced but did not author or
23  write?
24    A   No.

Page 39

1    Q   Okay.
2    A   I wouldn't, no.
3    Q   So you spent about two years at the Defender,
4  correct, from January of 2015 to December of 2016?
5    A   That is correct.
6    Q   And you wrote 250 stories during that time
7  period?
8    A   That is correct.
9    Q   Are all of these stories investigative
10  reporting?
11    A   No.
12    Q   How many of the 250 were investigative
13  reporting versus what you described as consumer
14  reporting?
15    A   Oh, I don't have that number for you.
16    Q   Could you estimate it for me?
17    A   I would say the majority of those were
18  investigative stories.
19    Q   And on average how much time would you spend
20  investigating a particular story before reporting on
21  it?
22    A   It depends on the nature of the story.
23    Q   On average during your two years at the
24  Defender, how much time would you spend investigating

Page 40

1  a story before reporting on it?
2    A   Again, it depends on the nature of the story.
3  Some stories you can report on them in as little as a
4  week or two and some stories were ongoing depending
5  on how complex the issue was that was being
6  investigated.
7    Q   I do understand that.  I'm just asking for an
8  average if you can give that to me.  How much time on
9  average would you spend investigating a story before
10  reporting on it understanding it could be a variety
11  depending on the type of story?
12    A   On average?
13    Q   On average.
14    A   I would say at least about 30 days.
15    Q   30 days, okay.
16        What was your yearly salary at the
17  Defender?
18    A   The yearly salary it should be on my taxes.
19  I don't recall off the top.
20    Q   So you were not paid by the piece.  You were
21  paid on a yearly basis?
22    A   Yeah.
23    Q   I should say you had a yearly salary?
24    A   Yes.

Page 41

1    Q   I imagine you were compensated throughout the
2  year, correct?
3    A   What do you mean when you say throughout the
4  year?
5    Q   So typically when someone has a yearly salary
6  they don't receive the entirety of the salary at one
7  time.  They receive payments throughout the year.
8    A   Correct.
9    Q   And that was your arrangement at the
10  Defender?
11    A   Yes.
12    Q   During your time at the Defender, did most of
13  your pieces focus on what you would describe as
14  racial injustice?
15    A   Most of them?
16    Q   Yes.
17    A   Is that your question, most of them?
18    Q   That's my question.
19    A   Now, when you say most of them, give me a
20  percentage.
21    Q   Well, I'll ask you to give me a percentage.
22        Of the stories you wrote at the Defender
23  during your two-year period there, what percentage
24  dealt with racial injustice?

Page 42

1    A   A lot of them did, but I don't know what the
2  percentage is.
3    Q   Would you say the majority?
4    A   No, I wouldn't say the majority.
5    Q   During your time at the Defender, did you win
6  any awards for your work?
7    A   No.
8    Q   And you left in December of 2016, is that
9  correct?
10   A   That is correct.
11   Q   Why did you leave?
12   A   I was laid off due to downsizing.
13   Q   Were you ever disciplined during your time at
14 the Defender?
15   A   No.
16   Q   And after leaving the Defender in December
17 of 2016, did you do any work in the journalism field
18 before your interaction with Michael Grabell in April
19 of 2017?
20   A   What do you mean by that?
21   Q   I mean you left the Defender in December
22 of 2016, correct?
23   A   That is correct.
24   Q   At that point did you do any journalism work

Page 43

1  subsequent to that period?
2    A   Yeah, I did.
3    Q   Okay.  What did you do?
4    A   I was still working on stories that were of
5  interest to myself and stories that I thought would
6  be of interest to the community, so that's what I
7  did.
8    Q   But the work you did after December of 2016
9  you were not being compensated for, correct?
10   A   That is correct.
11   Q   Now, at some point you became aware of an
12 open investigative reporter position at ProPublica
13 Illinois, is that correct?
14   A   That is correct.
15   Q   When did you first learn that these positions
16 were available?
17   A   I first heard about it it was in the spring
18 of 2017.
19   Q   When you say you first heard about it, what
20 do you mean by that?  How did you become aware?
21   A   I think I saw an ad online, an advertisement
22 that they had published.
23   Q   Do you recall where you saw this ad online?
24   A   No.  It was online.

Page 44

1    Q   Do you recall what website you were looking
2  at when you saw the ad?
3    A   I think it may have been ProPublica's
4  website.
5    Q   So in the spring of 2017 you went on
6  ProPublica's website and saw the ad?
7    A   Yeah, I did.
8    Q   What prompted you to go on the website?
9    A   I was a regular follower of ProPublica.
10   Q   How long did you follow ProPublica before you
11 saw this ad?
12   A   I had been reading their stories for a number
13 of years.  I don't know the total number of years but
14 it had been a number of years.
15   Q   When you say a number of years, could you
16 estimate that for me?
17   A   I'd say about three years.
18   Q   And after having followed their stories and
19 reading them for about three years you saw this ad
20 and you were intrigued by it, is that right?
21   A   Oh, yeah, definitely.
22   Q   Let's mark another exhibit.
23       Before we get to this exhibit, I'll ask
24 you why were you intrigued by the ad when you saw it?

Page 45

1    A   Which ad are you talking about?
2    Q   The ad we just mentioned, the ad you saw in
3  the spring of 2017?
4    A   Where's my copy?
5    Q   The court reporter is marking it for you.
6        (Whereupon Deposition Exhibit 9 was marked
7        for identification.)
8  BY MR. BLAKLEY:
9    Q   You know what, I'll strike the question and
10 rephrase it.
11       You saw this ad in the spring of 2017 but
12 you had been following ProPublica stories for about
13 three years prior, is that correct?
14   A   Yeah.
15   Q   What was your impression of the stories you
16 read in the three years prior to seeing this ad?
17   A   I thought they were good.  I thought they
18 were good stories.
19   Q   And ProPublica was an outfit that you wanted
20 to join, correct?
21   A   Oh, yeah.
22   Q   And you saw this ad in the spring of 2017,
23 true?
24   A   Uh-huh.

Page 46

1    Q    And the ad is dated February 21st, 2017, is
2    that right?
3    A    Yeah.
4    Q    What did you know about ProPublica prior to
5    seeing this ad?
6    A    They were an investigative newsroom started
7    in New York City by two billionaires.  That was it.
8    Q    And you read the stories and you liked what
9    they wrote, correct?
10   A    Uh-huh.
11   Q    Is that a yes?
12   A    Yeah, that is correct.
13   Q    Now, in April of 2017 you attended a play at
14   the Lookingglass Theater, is that right?
15   A    April?  Yeah, that is correct.
16   Q    Specifically April 23rd, 2017, right?
17   A    Yeah.
18   Q    What was the title of the play?
19   A    The title of the play was Beyond Caring.
20   Q    And afterwards did you attend a
21   question-and-answer session in which Michael Grabell
22   participated as a panelist?
23   A    I don't think it was Q and A at the first
24   one.  No, I don't recall it being a Q and A at the

Page 47

1    first one.
2    Q    How would you characterize it?
3    A    How would I characterize it?
4    Q    Right, how could you characterize it if it's
5    not a Q and A?
6    A    I think he was introduced as the reporter
7    that had inspired the play or whose work was
8    influenced by the play or something like that.
9    Q    And during this event after the play,
10   Mr. Grabell was answering questions posed to him?
11   A    I don't think it was a Q and A.  He was just
12   there.
13   Q    Okay.  Did you approach him after viewing the
14   play?
15   A    Yeah, I did.
16   Q    And did you initiate a conversation with him?
17   A    Yeah, I did.
18   Q    Where in the building did this conversation
19   take place?
20   A    I think we were standing -- we were standing
21   on the stage.
22   Q    Was anyone else present for the conversation
23   between you and Mr. Grabell?
24   A    That I don't recall.

Page 48

1    Q    So you can't tell me whether someone was
2    there or wasn't?
3    A    I don't recall.  You know, it was after the
4    play.  There was a bunch of people there.  Maybe they
5    were.  Maybe they weren't.  I couldn't specifically
6    tell you if they were or if they weren't.  I just
7    know that I interacted with him.
8    Q    You address this conversation in your answers
9    to interrogatories, correct?
10   A    Correct.
11   Q    Let's look at Exhibit 1.  I think you have it
12   in front of you.
13       Do you have it there, sir?
14   A    What page?
15   Q    Page 8.  Are you there?
16   A    Uh-huh.
17   Q    Okay.  You wrote that you, quote,
18   introduced -- well, strike that.
19       Subsection C, your answer to Interrogatory
20   No. 15 reads, quote, I introduced myself and inquired
21   about ProPublica's new office opening in Chicago,
22   unquote.  Do you see that?
23   A    Yes, I do.
24   Q    When you inquired about the new office, what

Page 49

1    exactly did you say to Mr. Grabell?
2    A    I don't recall exactly what my words were
3    back then, Jonathan.
4    Q    Did you mention that you knew that the
5    deadline for applying for an investigative reporter
6    position at ProPublica Illinois had passed?
7    A    Can you repeat that.
8    Q    Sure.
9       Do you recall mentioning to him that you
10   knew that the deadline for applying for an
11   investigative reporter position at ProPublica
12   Illinois had passed?
13   A    That is correct.
14   Q    You do recall that?
15   A    Yes.
16   Q    What was his response?
17   A    He encouraged me to apply anyway.
18   Q    And when you say encouraged, what do you mean
19   by that?  What exactly did he say to you?
20   A    I don't remember his exact words, but he
21   insinuated that they were still going through the
22   hiring process and he encouraged me.
23   Q    How long did the conversation with
24   Mr. Grabell last?

Page 50

1    A   I don't recall how long it lasted.
2    Q   Was it 30 seconds?
3    A   I don't recall.
4    Q   Can you estimate at all?
5    A   It wasn't long.  It wasn't like what we're
6  doing.
7    Q   Right.  Was it about a minute, two minutes,
8  any way you can estimate that for me?
9    A   It was probably a couple of minutes.
10   Q   He didn't provide you any guarantee that you
11 would be hired, correct?
12   A   Oh, no, no, no.
13   Q   He just let you know that you could submit
14 materials for consideration?
15   A   Yes.
16   Q   And you subsequently e-mailed material to
17 Mr. Grabell, is that true?
18   A   That is correct.
19   MR. BLAKLEY:  We'll mark another exhibit here.
20        (Whereupon Deposition Exhibit 10 was
21        marked for identification.)
22 BY MR. BLAKLEY:
23   Q   Mr. Hare, what's been marked as Exhibit 10
24 and handed to you is a document that contains two

Page 51

1  e-mails.  There was an e-mail on the bottom -- strike
2  that.
3        The bottom of Page 1 of Exhibit 10 is the
4  e-mail that you sent to Mr. Grabell, correct?
5    A   Yeah, I did send that to him.
6    Q   And you enclosed some material that you
7  wanted him to forward to Ms. Kiernan on your behalf,
8  is that fair?
9    A   I'm sorry, say that again.
10   Q   When you sent Mr. Grabell the e-mail, you
11 enclosed some material that you wanted Mr. Grabell to
12 forward to Louise Kiernan, correct?
13   A   Yes, correct.
14   Q   And you attached three pictures, one is a
15 picture of the cover of the Chicago Defender?
16   A   Yes.
17   Q   The second is a picture of the cover of the
18 Chicago Reader?
19   A   Yes.
20   Q   And the third is a picture of a screenshot of
21 witness slips, correct?
22   A   Yes.
23   Q   You also enclosed an audio file and an
24 introductory letter to Louise Kiernan, correct?

Page 52

1    A   Yes.
2    Q   In addition to providing Mr. Grabell with
3  materials, you contacted Ms. Kiernan directly, true?
4    A   Directly?  I didn't -- did I have her e-mail
5  address?
6    Q   I think respectfully you're the witness so
7  you have to answer the question.  If you don't
8  recall, you can tell me that.
9    A   Again, I don't recall because I didn't have
10 her e-mail address at the time when I met Michael.
11   MR. BLAKLEY:  We'll mark another exhibit as
12 Exhibit 11.
13        (Whereupon Deposition Exhibit 11 was
14        marked for identification.)
15 BY MR. BLAKLEY:
16   Q   Mr. Hare, what's just been handed to you and
17 marked as Exhibit 11 is a multipage document, and the
18 bottom of Page 1 indicates that you sent an e-mail to
19 Louise Kiernan on April 25th, 2017, at 11:11 a.m., do
20 you see that?
21   A   Yes, I do.
22   Q   Does this refresh your recollection as to
23 whether or not you sent an e-mail directly to
24 Ms. Kiernan?

Page 53

1    A   Absolutely it does.
2    Q   And you did send an e-mail, correct?
3    A   11:11.
4    Q   Is that a yes?
5    A   Yes.
6    Q   And you sent Ms. Kiernan the same materials
7  that you sent to Mr. Grabell except for the audio
8  clip, true?
9    A   Well, let's see.  Well, the audio file that
10 should have been sent as well, but according to
11 what's here the audio file is missing, so that would
12 be correct.
13   Q   Okay.  And this e-mail correspondence was the
14 first time you ever communicated with Ms. Kiernan,
15 true?
16   A   Yes.
17   Q   You later had an in-person encounter with
18 Ms. Kiernan, is that correct?
19   A   Oh, you better believe it.
20   Q   This also occurred at the Lookingglass
21 Theater on May 3rd, 2017, correct?
22   A   Yes.
23   Q   You address this in your answers to
24 interrogatories, so let's take a look at those,

Page 54

1  Exhibit 1.
2          Sir, do you have Exhibit 1 in front of
3  you?
4      A   Exhibit 1, yes.
5      Q   I'd like to direct you to Page 9.  On Page 9
6  there's a Subsection C that begins in the middle of
7  the page with the language I introduced, do you see
8  that?
9      A   Uh-huh.
10     Q   It reads, quote, I introduced myself for the
11 very first time in person at the Lookingglass Theater
12 on May 3rd, 2017, after a post-show discussion about
13 ethics.  Do you see that language?
14     A   Yes, I do.
15     Q   Do you recall what show you went to see at
16 the Lookingglass Theater on May 3rd, 2017?
17     A   Yeah, it was the same one, Beyond Caring.
18     Q   The same show?
19     A   The same show.
20     Q   Why is it that you went to see the same show?
21 MS. WILLIS:  Objection, relevance.
22 THE WITNESS:  Yeah, what would be the relevance?
23 It was the same show.
24

Page 55

1  BY MR. BLAKLEY:
2      Q   Can you please answer the question.
3      A   Could you repeat the question.
4      Q   Sure.
5          Why did you go see the same show?
6      A   Because Louise was there and I wanted to meet
7  her.
8      Q   How did you know Louise was going to be there
9  that day?
10     A   It was advertised.
11     Q   What advertisement did you see?
12     A   It was all online.
13     Q   Do you remember where online you saw this?
14     A   No, now that I don't recall, but it was
15 published.  That's how I found out about it, and I
16 think somebody else had mentioned it to me in
17 passing.
18     Q   When you say somebody else, do you recall who
19 that was?
20     A   No, I don't.
21     Q   You wrote, quote, our encounter was brief, do
22 you see that?
23     A   Uh-huh.
24     Q   How long did it last?

Page 56

1      A   It probably didn't last no longer than like a
2  minute and a half.
3      Q   And this was the first time you had ever
4  spoken to Ms. Kiernan in person, correct?
5      A   That is correct.
6      Q   And the only time you ever spoke to her in
7  person, true?
8      A   The only time.
9      Q   You never communicated with her again whether
10 in person or e-mail or letter or anything else?
11     A   No, no.
12     Q   What I said was correct?
13     A   Yeah, what you said is correct.
14     Q   Where in the building did this encounter take
15 place?
16     A   It was on the same stage where I met Michael.
17     Q   And you wrote in the third paragraph of
18 Subsection C, quote, she was alone when I approached
19 her.  Do you see that language?
20     A   Uh-huh.
21     Q   Was anyone else present for your encounter
22 with Ms. Kiernan on this day?
23     A   What do you mean when you say present?
24     Q   I'll rephrase it.

Page 57

1          When you had this encounter with
2  Ms. Kiernan, to your knowledge did anyone else hear
3  what you said to her and what she said to you?
4      A   I can't give you a definitive answer because
5  I don't know what other people heard.  It was just
6  she and I standing in front of each other.
7      Q   Correct.  So to your knowledge -- well,
8  strike that.
9          You have no knowledge whether anyone else
10 heard your encounter with her, correct?
11     A   That is correct.
12     Q   You wrote, quote, immediately upon shaking my
13 hand, her touch was cold and callous.  Do you see
14 that language?
15     A   Yes, I do.
16     Q   Okay.  What do you mean by cold and callous?
17     A   It wasn't the type of response that you would
18 anticipate receiving from someone in her position.
19     Q   Okay.  I'm going to break that down a little
20 bit.
21          When you say in her position, what do you
22 mean?
23     A   She's an ambassador for ProPublica.  She's
24 their editor-in-chief.  She sets the tone for the

Page 58

1  news organization.
2      Q   And when you say that she's the ambassador,
3  what type of response do you believe that an
4  ambassador needs to give?
5      A   The same type of response she treated
6  everybody else with which was welcoming and respect.
7      Q   Okay.  You say she treated everybody else
8  with.  How do you know how she treated other people?
9      A   Because I was watching her.  I was watching
10  her prior to approaching her.  She was engaged in a
11  conversation with a group of women.  They were her
12  peers.  They were on the panel with her, and based on
13  my observation everybody was getting along fine.
14  They were laughing.  They were exchanging, you know,
15  exchanging what their views and opinions were, and it
16  was very welcoming.
17      Q   How long were you watching her having a
18  conversation before you approached her?
19      A   I watched for about a good ten minutes.
20      Q   You watched her for ten minutes.  You did not
21  hear the conversation she had with these individuals
22  before you approached her, correct?
23      A   I could hear some of the conversation but I
24  don't recall.

Page 59

1      Q   Okay.  So you don't know what they discussed
2  during that conversation?
3      A   Well, they were still talking about the play
4  and the issues that the play had brought up.
5      Q   Okay.  But you don't know exactly what they
6  were saying to each other?
7      A   No.
8      Q   How far away from this conversation were you
9  when you were watching her for ten minutes?
10      A   I don't recall.
11      Q   Was she on the stage having a conversation at
12  that time?
13      A   Yeah, but you have to understand when I say
14  stage, there was no stage.  The stage was the same
15  floor that everybody stood on.  When you walked into
16  the theater, that floor became the stage once the
17  play started.
18      Q   Can you estimate how far away you were when
19  you were watching her for ten minutes having this
20  conversation?
21      A   I was maybe about four rows away from where
22  she and the other reporters were standing.
23      Q   Okay.
24      A   So I don't know how many feet that was.  I

Page 60

1  don't have the measurements of the theater in front
2  of me unfortunately.
3      Q   You wrote, immediately upon shaking my hand,
4  her touch was cold and callous, and when I asked you
5  to describe what you meant by cold and callous, you
6  said it wasn't the type of reaction you would expect.
7  Can you be any more specific other than telling me
8  that?
9      A   No, that's what it was.
10      Q   Okay.  Can you describe when you -- strike
11  that.
12          She shook your hand, correct?
13      A   I'll say she touched my hand.
14      Q   Okay.  Well, describe for me the difference.
15      A   I wouldn't really call it -- Jonathan, the
16  way this woman treated me, it's totally unacceptable,
17  completely unacceptable, and it was very demeaning
18  and disparaging.  I didn't know what was going on at
19  the time so I just kind of, you know, just put it in
20  the back of my mind because I wanted to work for the
21  news organization.
22      Q   I'm going to move to strike as nonresponsive.
23          Sir, I understand you're passionate about
24  this and you might have points you want to make.  You

Page 61

1  have very capable counsel who can ask you questions
2  after I'm finished, but the process doesn't work
3  unless you answer the questions that I ask you
4  respectfully.
5      A   I'm trying to answer it the best I can.
6      Q   I understand that.
7          So when I asked you, you mentioned she
8  didn't shake your hand, she just touched it.  What's
9  the difference?
10      A   We held hands.  We did hold hands.
11      Q   Okay.  So she shook your hand, correct?
12      A   Yeah, she -- well, if you want to call that a
13  handshake.
14      Q   You wrote --
15      A   It wasn't like what we did.
16      Q   Okay.  You wrote I could see her body
17  language appear to recoil as she withdrew her hand
18  away from mine?
19      A   Yes.
20      Q   When you say her body language recoiled, what
21  do you mean?
22      A   It was like she was backing back.
23      Q   When you say backing back, what do you mean?
24      A   Backing back like backing away from me.

Page 62

1   Q   Did she take a step away from you?
2   A   Yeah.
3   Q   How many steps did she take away from you?
4   A   I don't recall how many steps she took.  I
5   don't recall.
6   Q   When you approached her, was her back to you?
7   A   When I approached her, no.
8   Q   Okay.  Was she in the middle of a
9   conversation when you approached her?
10  A   No, I made sure she was finished talking with
11  her colleagues.
12  Q   Okay.  Again, you wrote that her body
13  language recoiled, can you be any more specific other
14  than telling me that she appeared to be backing away
15  from you?
16  A   Her body language recoiled.  I think that
17  says it all right there.
18  Q   I'm just asking if you can explain that any
19  further and give me any other detail other than
20  telling me that she appeared to back away from you?
21  A   No.
22  Q   You wrote the message -- strike that.
23      You wrote, quote, this peculiar behavior
24  took me completely by surprise and the message she

Page 63

1   sent was that I was not welcome.  Do you see that?
2   A   Yes, I do.
3   Q   When you discuss the message that she sent,
4   this is your interpretation of her body language,
5   correct?
6   A   Yeah, it would have been anybody's
7   interpretation had they been in my shoes.
8   Q   She did not tell you that she didn't want to
9   meet with you, fair?
10  A   Well, her body language -- she communicated
11  very clear with her body language that she did not
12  want to be bothered with me.  That was very clear to
13  me.
14  Q   This is my question, sir.
15      Did she say to you verbally that she did
16  not want to speak with you?
17  A   No, she didn't.
18  Q   Okay.
19  A   But her body language sure did.
20  Q   How much time passed between you approaching
21  her and her appearing to recoil as you described it?
22  A   That was like in the first, within the first
23  minute upon us, you know, shaking hands.  That all
24  happened right then and there and within the first

Page 64

1   minute.
2   Q   That all happened within a matter of seconds,
3   would you agree?
4   A   Yeah.
5   Q   Okay.  The interaction you're describing and
6   your reaction to her, the body language that you
7   described, that all happened in a matter of seconds,
8   correct?
9   A   I guess, yeah, it was about -- it was seconds
10  but it could have been a minute.
11  Q   Explain that to me.  How can it be both a
12  matter of seconds and an entire minute?
13  A   I mean, we were there standing in front of
14  each other.  I'm talking about the duration of our
15  entire encounter.
16  Q   You approached her, she appeared to recoil.
17  That happened -- in your language she appeared to
18  recoil.  That happened in a matter of seconds,
19  correct?
20  A   Yeah, that was in the course of seconds.
21  Q   You wrote she could care less about who I was
22  or my desire to work for ProPublica.  Do you see that
23  language?
24  A   Yes.

Page 65

1   Q   She never verbally said that to you, did she?
2   A   No, she never verbally said that.
3   Q   Okay.  So you're making the assumption about
4   what she cares about and what she feels based upon
5   your interpretation of her body language?
6   A   At that particular point in time that
7   statement that you just read about she could care
8   less, there was no way for me to be able to determine
9   that at the time that this was happening.  So that
10  what you just read is my opinion based on all of the
11  information that I gathered looking back on the
12  situation once I realized what was going on that I
13  was being discriminated against.  That's my answer.
14  Q   You basing -- let me investigate that for a
15  little bit.
16      When answering this interrogatory, you're
17  discussing this in a chronological order and you say
18  after discussing the withdraw of her hand that she
19  could care less about who I was and my desire to work
20  for ProPublica, do you see that language?
21  A   Yes, I do.
22  Q   And what you just told me is that you did not
23  make a determination about how she felt at the time
24  but now looking back on it you believe that that's

Page 66

1  how she felt?

2      A   What I'm saying, Jonathan, is this.  At that

3  particular point in time when this was happening, I

4  knew something wasn't quite right but I didn't have

5  enough information to make a determination about

6  exactly what I felt that it could be.

7      Q   Okay.  You've never spoken to her?

8      A   Never, not since that incident.

9      Q   She never mentioned to you anything that

10 would give you the impression that she could care

11 less about who you are or your desire to work for

12 ProPublica, correct?

13     A   Repeat that one more time.

14     Q   She's never verbally said anything to you

15 that would give you the impression that, quote, she

16 could care less about who I was or my desire to work

17 for ProPublica?

18     A   She didn't verbally articulate that, but I

19 could tell in her body language that's exactly what

20 she meant.

21     Q   Okay.  Well, now you told me two different

22 things.

23         Based upon her body language you believe

24 that she could not care less about who I was or my

Page 67

1  desire to work for ProPublica?

2      A   Based on her body language.

3      Q   Okay.  You wrote, quote, she mentioned that

4  it was a bit overwhelming setting up the office so I

5  offered some encouragement.  I smiled and said I was

6  patient.  Do you see that language?

7      A   Yes, I do.

8      Q   So she volunteered to you during this minute

9  encounter that it was a bit overwhelming setting up

10 the office?

11     A   That's what she said.

12     Q   She shared that with you, is that correct?

13     A   Yeah, that's correct.

14     Q   So she didn't immediately walk away.  She

15 spoke to you, correct?

16     A   Right, she did speak to me.

17     Q   During this encounter did she mention your

18 race at all?

19     A   No.

20     Q   Did she mention your skin color at all?

21     A   No, she didn't.

22     Q   Did she mention your age at all?

23     A   No, she didn't.

24     Q   So she shook your hand and she spoke with you

Page 68

1  for a little bit and she declined your offer to help

2  her put on her coat, correct?

3      A   That is correct.

4      Q   And all of this happens in about a minute?

5      A   Minute, minute and a half.

6      Q   So ultimately you have no idea how she felt

7  or what she was thinking during this encounter,

8  correct?

9      A   Well, I wouldn't necessarily say that.  Her

10 body language -- you know it as well as I know it as

11 well as everybody at this table knows there is

12 nonverbal communication, and her body language was

13 saying something totally different in regards to me.

14 Now, the body language that she exhibited when she

15 was talking to her white peers was totally different.

16     Q   Do you know who the individuals were that she

17 was speaking with?

18     A   She was talking to the other panelists that

19 were part of the Q and A session.

20     Q   Do you know how familiar she was with these

21 individuals?

22     A   How would I know her relationship with them?

23     Q   Okay.  In June of 2017 you submitted job

24 application materials to ProPublica, is that right?

Page 69

1      A   That is correct.

2      Q   What prompted you to send materials to

3  ProPublica?

4      A   What prompted me?

5      Q   Right, in June of 2017?

6      A   The portal opened up.

7      Q   When you say the portal, what are you

8  referring to?

9      A   The online application.  Excuse me.  Hold on

10 a second.

11         Okay.  Can you repeat the question.

12     Q   Sure.

13         You mentioned that what prompted you to

14 submit materials to ProPublica in 2017 was, quote,

15 the portal opened up?

16     A   Yeah, the online application portal.

17     Q   How were you aware that the online

18 application portal opened up?

19     A   I was watching the website.

20     Q   Did you see an advertisement or a job posting

21 that informed you that --

22     A   Yeah, I did.

23 MR. BLAKLEY:  Let's mark another exhibit here.

24         (Whereupon Deposition Exhibit 12 was

Page 70

1          marked for identification.)
2   BY MR. BLAKLEY:
3       Q   Mr. Hare, what's been handed to you and
4   marked as Exhibit 12 is the job posting.  The title
5   of the document reads ProPublica Is Hiring (More!)
6   Reporters.  Do you see that?
7       A   Yes, I do.
8       Q   It's also Bates stamped KH104 at the bottom
9   right-hand corner, do you see that?
10      A   Where am I looking?
11      Q   You're looking at the document that should
12  have just been handed to you, Exhibit 12.
13      A   What was the last thing you said about --
14      Q   There's a number that appears on the bottom
15  right-hand corner, KH104?
16      A   I don't have that.
17      Q   You don't have that on your version?  I have
18  it on mine, but it's the same thing.
19      MS. WILLIS:  Where do you have it on yours?
20      MR. BLAKLEY:  I have it on mine, but you have a
21  different version of the same thing.
22      MS. WILLIS:  Okay.
23  BY MR. BLAKLEY:
24      Q   In any event, this is the document that you

Page 71

1   viewed that prompted you to submit materials to
2   ProPublica, correct, in June of 2017?
3       A   Yes, that is correct.
4       Q   When did you first see it?
5       A   When did I first see it?
6       Q   Correct.
7       A   I don't recall.
8       Q   Okay.  You see at the top left-hand corner
9   it's dated May 19th, 2017, correct?
10      A   Uh-huh.
11      Q   And unlike Exhibit 7, the February 2017
12  posting, this one does not reference ProPublica
13  Illinois, does it?
14      A   No, I don't see ProPublica Illinois, but it
15  says ProPublica.
16      Q   Okay.  And it notes a submission deadline of
17  June 4th, 2017, correct?
18      A   Yeah, that is correct.
19      Q   And you submitted material on June 4th, 2017,
20  is that right?
21      A   Yeah.
22      Q   Via the online portal that you just
23  mentioned?
24      A   That is correct.

Page 72

1       Q   And you filled out a form and you uploaded
2   documents, correct?
3       A   Yes.
4       MR. BLAKLEY:  We'll mark another exhibit.
5          (Whereupon Deposition Exhibit 13 was
6          marked for identification.)
7   BY MR. BLAKLEY:
8       Q   Mr. Hare, what's been marked as Exhibit 13
9   and what's just been handed to you are three stapled
10  documents.  The first page is a screenshot of
11  Screendoor.  The second two pages are an export from
12  Screendoor.
13          The first page indicates, again, that you
14  submitted materials on June 4th, 2017, at 4:46 p.m.,
15  correct?
16      A   Yeah, that is correct.
17      Q   And then when you look at the second and
18  third pages, they tell us that you uploaded a resume
19  already identified as Exhibit 6, correct?
20      A   Uh-huh.
21      Q   You also uploaded a reporting memo, is that
22  correct?
23      A   Yeah, that is correct.
24      MR. BLAKLEY:  Let's mark another exhibit.

Page 73

1          (Whereupon Deposition Exhibit 14 was
2          marked for identification.)
3   BY MR. BLAKLEY:
4       Q   Mr. Hare, what's been marked as Exhibit 14
5   and just handed to you is the reporting memo that you
6   uploaded via Screendoor, correct?
7       A   Yeah, that is correct.
8       Q   And looking at the second page, second and
9   third pages of Exhibit 13, this tells us that you
10  also provided links to three stories that you had
11  authored, correct?
12      A   Can you repeat that, I'm sorry.
13      Q   Sure.
14          Exhibit 13, the Screendoor documents,
15  Pages 2 and 3 indicate you provided links to three
16  stories that you authored at the Chicago Defender,
17  correct?
18      A   Yes, yes.
19      Q   You provided no other material other than
20  what we just discussed, the three stories, the links
21  to the three stories, the resume and the reporting
22  memo, correct?
23      A   Correct.
24      Q   Now, Mr. Hare, you maintain a blog, a

Page 74

1   WordPress blog, correct?
2       A   Uh-huh.
3           (Whereupon Deposition Exhibit 15 was
4           marked for identification.)
5   BY MR. BLAKLEY:
6       Q   Mr. Hare, what we've marked as Exhibit 15 and
7   handed to you is a printout of your blog posts.  You
8   have entitled your blog Defending Chicago, correct?
9       A   That is correct.
10      Q   When did you establish the blog?
11      A   I would have to go into the account and give
12  you an exact date if that's what you're looking for.
13      Q   Can you give me an estimate?  Was it 2016,
14  2015, what year?
15      A   I believe it was sometime in 2017.
16      Q   Why did you establish the blog?
17      A   I established the blog as a source where I
18  could post stories.
19      Q   Any other reason that you established it or
20  you just wanted a place to post stories?
21      A   Yeah, I wanted a place to post stories.
22      Q   Among other things on the blog you discussed
23  your in-person encounter with Ms. Kiernan and the
24  filing of this lawsuit, isn't that true?

Page 75

1       A   Yes, I did.
2       Q   Now, the first post was posted on
3   October 31st, 2017, and the story begins on Page 27
4   of the exhibit, is that correct?
5       A   I'm sorry, what was the question?
6       Q   Your first blog post was posted October --
7       A   Okay, the first blog post?
8       Q   Correct.
9       A   Yeah.
10      Q   Was posted on October 31st, 2017, correct?
11      A   Yeah.
12      Q   And your second blog post was on May 4th,
13  2018, correct?  The story begins on Page 21 of the
14  exhibit.
15      A   Yeah, that is correct.
16      Q   Neither the first or second story posts have
17  anything to do with ProPublica, correct?
18      A   That is correct.
19      Q   Now, your first post about ProPublica is on
20  January 1st, 2019, and begins on Page 18 of the
21  exhibit, isn't that true?
22      A   Could you repeat that.
23      Q   Sure.
24          Your first post about ProPublica was

Page 76

1   posted on January 1st, 2019?
2       A   That's not correct.
3       Q   Okay.  When was your first post about
4   ProPublica?  I'll refer you to Page 21 of the
5   exhibit.
6       A   The first post about ProPublica?
7       Q   Correct.  Page 21 indicates that your first
8   post about ProPublica was on January 1st, 2019.
9       A   Oh, okay.
10      Q   That's correct?
11      A   Yeah, yeah, uh-huh.
12      Q   And so this is after your EEOC claim was
13  dismissed and after you had met with counsel about
14  filing this lawsuit, correct?
15      A   I believe so.
16      Q   Now, your second post about ProPublica is
17  dated April 12th, 2019, and begins on Page 13 of the
18  exhibit, isn't that correct?
19      A   April 16th, 2019?
20      Q   April 12th, 2019.
21      A   What page?
22      Q   So the date of the post is on Page 18 but the
23  post begins on Page 13 of the exhibit.
24      A   Oh, okay, yeah.

Page 77

1       Q   And in this post you discuss your encounter
2   with Ms. Kiernan that occurred about two years prior,
3   correct?
4       A   That is correct.
5       Q   Now, your third post about ProPublica is
6   dated April 16th, 2019, and begins on Page 11, isn't
7   that true?
8       A   Let me see.  What's that date again,
9   Jonathan?
10      Q   The date was April 16th, 2019.  The date
11  appears on Page 13 of the exhibit.  The story begins
12  on Page 11 of the exhibit.
13      A   That is correct.
14      Q   Now, you wrote the title of this April --
15  strike that.
16          The title of this April 16th, 2019 posting
17  is Op:Ed: ProPublica & ProPublica Illinois Hit With
18  Discrimination Suit.  Do you see that?
19      A   Yeah.
20      Q   And included in this post you enclosed a
21  two-minute audio clip that you produced, correct?
22      A   Yes.
23      Q   And in that clip you described yourself as a
24  reporter that, quote, wrote three groundbreaking

Page 78

1  stories in 2016, correct?
2      A   That is correct.
3      Q   You stated that Ms. Willis filed a lawsuit on
4  your behalf, true?
5      A   Correct.
6      Q   Okay.  You call ProPublica a billionaire
7  funded racist news organization, correct?
8      A   Absolutely.
9      Q   And you asked others to reach out to you if
10 they applied to ProPublica and were not hired and
11 that, quote, today was their, quote, lucky day,
12 correct?
13     A   That is correct.
14     Q   Did anyone reach out to you?
15     A   Not to my knowledge.
16     Q   In addition to stating that ProPublica is a,
17 quote, racist news organization, you have also stated
18 that Louise Kiernan is a racist, correct?
19     A   Did I say that?
20     Q   I'm asking you did you say that?
21     A   What page?
22     Q   Have you said that at any time that she's a
23 racist?
24     A   Is it in the blog?

Page 79

1      Q   I'm asking you if you recall saying that?
2      A   I'm saying it to you now she is a racist, but
3  what page are you referring to?
4      Q   So you have stated that, that she's a racist,
5  correct?
6      A   In person I'm telling you this, so if you're
7  referring to where it's written in my blog, where is
8  it?
9      Q   I'll refer you to where it's written.  Let's
10 look at Exhibit 5.
11     A   Well, Exhibit 5 is not what we're talking
12 about right now.
13     Q   I've moved on to Exhibit 5.
14     A   Okay.
15     Q   What's previously been marked as Exhibit 5 is
16 your response letter to my letter to your counsel in
17 September of 2019.  You recall writing this, correct?
18     A   Yeah, Exhibit 5, that is correct.
19     Q   Okay.  And towards the middle of the page
20 there's a paragraph that reads, quote, if your client
21 was really interested in settling this case out of
22 court and making me whole, then we would have what we
23 need to move forward past this painful and depressing
24 episode with the cultural appropriating, racist and

Page 80

1  liar Louise Kiernan and her New York colleagues.  Do
2  you see that language?
3      A   Oh, yes, I do.
4      Q   Okay.  Again, this is a letter that you wrote
5  addressed to me as ProPublica's counsel, correct?
6      A   Yes.
7      Q   Now, I think we can agree that discrimination
8  of any kind is deplorable, isn't that right?
9      A   Yes.
10     Q   And calling someone a racist or a sexist or
11 an ageist it's a very, very serious thing to say to
12 someone, correct?
13     A   I would imagine it is.
14     Q   And it's one of the most severe criticisms
15 you can make of anyone's character, isn't that right?
16     A   I would imagine so.
17     Q   As a journalist yourself you would agree that
18 you shouldn't make statements like that on a whim,
19 right?  You need some support for something like
20 that, something so grave, correct?
21     A   I have the support.
22     Q   Okay.  But here you have -- well, that's not
23 the question I asked you.
24         You would agree that you should not make a

Page 81

1  statement like that without having some support,
2  correct?
3      A   That's a fair statement.
4      Q   Okay.  But here you are claiming that
5  Ms. Kiernan is a racist and a liar based on a minute
6  interaction with her.  You have no problem doing that
7  here, correct?
8      A   No, that's not what -- no, no, no, no, I
9  totally disagree with that statement.
10     Q   Okay.
11     A   It's not based on solely that interaction,
12 that one to one-and-a-half minute interaction.
13 That's not what that statement is based on.  It's
14 based on the totality of all the information that I
15 have seen, observed and have gathered.
16     Q   The information you've seen, observed and
17 gathered?
18     A   That's what my opinion is based on, and it's
19 my opinion.
20     Q   It's your opinion, correct.
21     A   Based on the facts that I have collected and
22 gathered.
23     Q   Here's my question.  The facts you've
24 gathered, this information that you say that you've

Page 82

1  obtained, it is not what Ms. Kiernan has said to you
2  or written to you, correct?
3      A    What's correct?
4      Q    What you're basing this characterization of
5  her as a racist.  You say it's not only based on this
6  minute interaction with her, it's based on all this
7  other --
8      A    The whole newsroom.  It's a racist newsroom,
9  Jonathan.
10      Q    I'm asking you about these statements about
11  Ms. Kiernan specifically.  You claim she's a racist
12  based on your minute interaction with her, correct?
13      A    No, it's not just that alone.
14      Q    And you say it's not just that.  It's all
15  these other things that you found out about --
16      A    Which we're getting to.
17      Q    What I'm saying is these other things you're
18  describing, it's not what she said to you or written
19  to you.  It is not based on any communication you've
20  had with her, correct?
21      A    You're correct, she did not say that out of
22  her mouth.
23      Q    Correct, okay.
24      A    But her actions.

Page 83

1      Q    And by actions you're talking about the
2  minute --
3      A    No, I'm talking about the totality.
4      Q    What totality?
5      A    The totality of this whole issue, the whole
6  reason why we're here today.
7      Q    Okay.  I have to make this clear.  You
8  interacted with this woman for a minute, correct, one
9  minute at the Lookingglass Theater?
10      A    A minute to a minute and a half.
11      Q    Okay.  We've discussed your characterization
12  of Ms. Kiernan as a racist.  You've also
13  characterized her as a liar, correct?
14      A    Yes, she's a liar.
15      Q    Let's look at Exhibit 15 again very briefly.
16  The very first page of the exhibit contains a
17  picture, and in that picture it contains the
18  language, quote, ProPublica's Illinois
19  editor-in-chief Louise Kiernan tell a lie to a
20  federal investigator.  Do you see that?
21      A    Yes, I do.
22      Q    So you addressed this in your answers to
23  interrogatories as well, isn't that right?
24      A    I did.

Page 84

1      Q    Let's look at Exhibit 1 again.
2              You wrote, quote, in her phone interview
3  with a federal investigator, she stated I applied to
4  her private e-mail for the job.  This is a lie and
5  patently untruthful, is that right?
6      A    What page are you on?
7      Q    I'm on Page 9.
8      A    Yeah, that is correct.
9      Q    Okay.  So you claim that she's a liar because
10  she characterized your April 25th, 2017 e-mail as an
11  application, correct?
12      A    Yes.
13      Q    So just to be clear, when you sent her the
14  two-page letter of introduction and you sent her the
15  links to your stories and you sent her the images you
16  were not applying for a job?
17      A    No.  How can I have been applying for a job
18  when I had missed the deadline, Jonathan?
19      Q    So if you weren't applying for a job why send
20  her any materials at all?
21      A    It was an inquiry to see if it was a
22  possibility.
23      Q    Did you need to send the materials to
24  inquire?

Page 85

1      A    I sent it out of my freewill.
2      Q    Here's my question.  To inquire about whether
3  they're still hiring, did you need to submit
4  materials?
5      A    It's relative.  Maybe I did, maybe I didn't,
6  but I did in this case.
7      Q    Okay.  Once ProPublica decided not to hire
8  you, did you follow up with anyone at ProPublica?
9      A    I believe I did.
10      Q    Who?
11      A    It was -- it may have been -- I think I sent
12  an e-mail.  I think I sent an e-mail to somebody in
13  New York.
14      Q    Okay.  You think you sent an e-mail to
15  someone in New York?
16      A    Yeah.
17      Q    Who did you send an e-mail to?
18      A    That I don't remember who I sent it to.  I
19  think I did.
20      Q    So you may have or you may not have?
21      A    I think I did though.
22      Q    What makes you think that you sent an e-mail
23  to someone in New York?
24      A    Because when I didn't hear from anybody, I

Page 86

1   was wondering what was going on, so that may have
2   prompted me to send an e-mail to somebody in New York
3   because I didn't hear from anybody in Illinois.
4       Q   Now, when did you send this e-mail?
5       A   When did I send it?
6       Q   Right.
7       A   It would have been sometime in the fall.
8       Q   If you were applying for a position in
9   Illinois, why would you send an e-mail to someone in
10  New York?
11      A   I was reaching out to anybody to get a
12  response about the application that I had submitted
13  in Illinois.  That's why I sent it if I sent it.
14      Q   In this case we've asked you to produce any
15  communications you've had with ProPublica personnel.
16  Did you provide this e-mail to your counsel?
17      A   I couldn't find it.
18      Q   Okay.  So you don't have a copy of this
19  e-mail.  You can't tell me when you sent it or who
20  you sent it to, correct?
21      A   That is correct.
22      Q   After you weren't hired by ProPublica, did
23  you seek -- strike that.
24          After you weren't hired by ProPublica, you

Page 87

1   did not seek employment in journalism with anyone,
2   correct?
3       A   That is correct.
4       Q   Okay.  No other employment in journalism?
5       A   That is correct.
6       Q   You didn't look for any other jobs or submit
7   applications to any other news outfit, correct?
8       A   That is correct.
9       Q   And you believe that ProPublica discriminated
10  against you on or about June 4th, 2017, correct?
11      A   I didn't say that.
12      Q   Let's look at Exhibit 6.  Do you have the
13  document in front of you, sir?
14      A   Yes, Exhibit 6 I do.
15      Q   Okay.  And this is the document that begins
16  with charge of discrimination at the top?
17      A   Uh-huh.
18      Q   If you look towards the middle of the page
19  there's a section that reads dates discrimination
20  took place.  It says earliest June 4th, 2017, latest
21  June 4th, 2017.  So this is what you told the EEOC,
22  the discrimination took place against you on
23  June 4th, 2017, correct?
24      A   Yeah, that's what it says in the charge.

Page 88

1       Q   Let's look at your answers to interrogatories
2   again.
3       A   Yeah, that's the first time I've ever seen
4   that.
5       Q   I'm sorry, you said that's the first time
6   you've seen your EEOC charge?
7       A   No, that's the first time I've seen those
8   dates.
9       Q   Exhibit 1 on Pages 10 and 11, we asked you to
10  identify every job or position --
11      A   I'm sorry, say that again.
12      Q   Sure.
13          On Exhibit 1 on Pages 10 and 11 -- are you
14  with me?
15      A   Give me one second.
16      Q   Sure.
17      A   On 10 and 11?
18      Q   Correct.
19      A   Okay.
20      Q   We asked you to identify every job or
21  position you applied for from April 24th, 2017,
22  onward, do you see that?
23      A   Yes, that is correct.
24      Q   And after submitting materials to ProPublica

Page 89

1   through Screendoor on June 4th, 2017, you did not
2   apply for any employment position until October 2018,
3   correct?
4       A   Uh-huh, that is correct.
5       Q   And you applied to the USPS in October
6   of 2018?
7       A   Uh-huh.
8       Q   Is that yes?
9       A   Yeah, that is correct.
10      Q   And you were not hired, correct?
11      A   That is correct.
12      Q   And you were not interviewed, is that
13  correct?
14      A   That is correct.
15      Q   Do you believe that you were qualified for
16  that job?
17      A   Yeah, if I had applied for it, yeah.
18      Q   Okay.  You mean -- when you say if I had
19  applied for it, you mean you wouldn't have applied
20  unless you believe you were qualified?
21      A   That is correct.
22      Q   Okay.  So do you believe that the USPS
23  discriminated against you?
24      A   No.  I wasn't interviewed because I was stuck

Page 90

1  in traffic.
2      Q   I see.  In November you began driving for
3  Lyft?
4      A   Yeah, that is correct.
5      Q   Are you still a Lyft driver?
6      A   No.
7      Q   When did you stop working as a Lyft driver?
8      A   I stopped working for Lyft after I started
9  taking that medication.
10     Q   In 2019?
11     A   Yeah.
12     Q   Okay.  So you worked as a Lyft driver from
13 November 26, 2018, until sometime in 2019, correct?
14     A   Uh-huh, that is correct.
15     Q   Have you held any employment since -- well,
16 strike that.
17         When in 2019 did you stop working as a
18 Lyft driver?
19     A   It was after I started taking the meds.
20     Q   Okay.  When in 2019 was that?
21     A   That was August or end of August beginning of
22 September, sometime around in that window.
23     Q   So have you had any employment since August
24 or September of 2019?

Page 91

1      A   Yeah.
2      Q   Okay.  What have you done since then?
3      A   I drive for Uber.
4      Q   When did you begin driving for Uber?
5      A   After -- it was after Lyft and sometime
6  around -- it was in that September window.
7      Q   Of 2019?
8      A   Yeah, that is correct.
9      Q   So why did you stop driving as a Lyft driver?
10     A   Because the meds was like making me crazy.
11 You can't take that medication and drive at the same
12 time.
13     Q   But you've taken the medication continuously
14 from September of 2019 to now, correct?
15     A   No, it has not been continuously.
16     Q   Okay.  You're taking it -- you've taken it
17 today, correct?
18     A   No, I did not take it today.
19     Q   Okay.  When you say that medication, we
20 discussed medication that you're on today and you
21 mentioned something that begins with an S,
22 Sertraline, something like that, correct?
23     A   No, you asked what medication was I taking.
24 You asked me what medication was I currently taking.

Page 92

1      Q   Right.  In September of 2019 what medication
2  did you begin taking?
3      A   It was the one that my doctor prescribed me.
4  I don't know the name of it.  It starts with an S,
5  but I don't know the name of it.
6      Q   That's the same medication you said you took
7  today, correct?
8      A   Did I say I took that medication today?
9      Q   Yes, you did say that at the beginning of the
10 deposition.
11     A   I did?
12     Q   Yes, you did.
13         Did you take it this morning?
14     A   If I'm driving, no.
15     Q   Okay.  So when's the last time you took this
16 medication?  You haven't taken it since September
17 of 2019 because you've been working as a Lyft and
18 Uber driver since then, correct?
19     A   No, I took it a couple times in between.  I
20 don't have the dates in front of me.
21     Q   How many times have you taken the medication
22 between September 2019 and today?
23     A   I've taken it quite a bit, but I don't have
24 the dates.  I didn't count them.  The days I'm not

Page 93

1  driving I'll take the medication because you can't do
2  both.
3      Q   How many days a week do you drive?
4      A   It varies.
5      Q   On average from September of 2019 to today,
6  how many days per week have you driven as a Lyft or
7  Uber driver?
8      A   It could be three, four, five days.  It just
9  depends.
10     Q   Depends on what?
11     A   It depends on a lot of things.
12     Q   When you say a lot of things, what do you
13 mean?
14     A   It depends on how that medication makes me
15 feel.
16     Q   So it doesn't always make you feel that
17 you're unable to drive a car, correct?
18     A   Usually when I'm driving I cannot take the
19 medication.
20     Q   But you just told me that whether or not you
21 can drive and take the medication depends on how the
22 medication makes you feel.
23     A   What did I say?
24     Q   I'm trying to get a sense of what medication

Page 94

1  you're taking and how it affects your ability to
2  drive, okay.
3         Initially you told me that you took this
4  medication this morning that has some sort of effect
5  on you. You've since told me that you can't take it
6  when you drive but you've been driving as a Lyft or
7  Uber driver for almost the last year?
8     A  Well, I wasn't taking the meds when I was
9  driving for Lyft because it wasn't prescribed to me
10 until after. I stopped with Lyft when I started
11 taking the medication.
12    Q  But you told -- okay, so you didn't take the
13 medication until September of 2019?
14    A  It was about the time that she prescribed it.
15 It was the end of August or beginning of September.
16 I don't have the exact date in front of me. It might
17 be in the records.
18    Q  When did you start driving for Uber?
19    A  After I stopped driving for Lyft, around that
20 same time.
21    Q  How long after you stopped driving for Lyft
22 did you start driving for Uber?
23    A  It could have been about a week or two.
24    Q  So when you were driving for Uber you were

Page 95

1  still taking this medication?
2     A  In the beginning, yes, but then the problems,
3  I couldn't take the medication.
4     Q  Okay. So you stopped taking the medication
5  but you still drive for Uber, correct?
6     A  Yes.
7     Q  Let's look at Page 7 of your Exhibit 1.
8     MS. WILLIS: Can we take a brief break?
9     MR. BLAKLEY: Sure.
10         (Recess was taken.)
11 BY MR. BLAKLEY:
12    Q  Mr. Hare, we're returning from a brief break.
13 You are aware that you're still under oath, correct?
14    A  That is correct.
15    Q  Do you have Exhibit 1 in front of you, sir?
16    A  Yes.
17    Q  In answering Interrogatory No. 12 on Page 7
18 of Exhibit 1, you wrote the following, quote, my
19 career with a respected news organization of any
20 kind, black or white, is for all intents and purposes
21 dead. Do you see that language?
22    A  Yes.
23    Q  First, what do you mean by black or white
24 when referring to a respected news organization?

Page 96

1     A  Any news organization if I went to try to
2  apply at a black news organization or another white
3  news organization after I had this suit and then the
4  allegations, I mean, once they found out, in my mind
5  they wouldn't want to hire me.
6     Q  Okay. Now, you said a black news
7  organization or a white news organization. Is it
8  your opinion that a news organization has to be
9  characterized by race?
10    A  Well, I had worked historically at the
11 Chicago Defender which was a newspaper that focused
12 on the black community, so that's what I meant by
13 that.
14    Q  Now, do you believe that a news organization
15 that reports stories that impact minority -- well,
16 strike that.
17         Do you believe that a news organization
18 that writes stories that, discuss the black
19 community, for example those stories can only be
20 written by black journalists?
21    A  No, I don't believe that. It could be
22 written by a black, white, Hispanic, Asian.
23    Q  Okay. And so when you say black or white
24 news organization here, is that the way you view all

Page 97

1  news organizations that they have to have some sort
2  of racial designation?
3     A  No, that's not correct.
4     Q  Okay. You also wrote, quote, in fact my
5  earning capacity has been irreparably diminished as
6  no publisher or newsroom is ever going to want to
7  hire me. Do you see that?
8     A  Yes.
9     Q  And you said, quote, due to defendant's
10 discriminating actions forcing me into this legal
11 action to protect my civil rights. Do you see that?
12    A  Yes.
13    Q  So I want to focus on the forcing me into
14 this legal action language.
15         This lawsuit was initiated by you,
16 correct?
17    A  Yes.
18    Q  And you wrote that no publisher or newsroom
19 is ever going to want to hire me, but we've
20 established that you haven't applied to any other
21 newsroom or any other journalistic outfit, correct?
22    A  That is correct, and the reason being is
23 because when I launched this lawsuit I became -- I
24 started becoming depressed.

Page 98

1    Q   Okay.  But you don't know whether any
2  publisher or newsroom would ever hire you because
3  you've haven't applied for those jobs, correct?
4    A   That is correct that I haven't applied, but
5  in my mind once this information came out and it was
6  revealed that I'm suing a major news organization,
7  would you want to hire me?
8    Q   That's an assumption you're making.  You
9  haven't made any inquiries, correct?
10   A   And I do have the right to make that
11  assumption.  Would you want to hire me?
12   Q   Has any medical professional stated at any
13  time that you were unable to work?
14   A   No.
15   Q   Has any medical professional ever stated at
16  any time that your encounter with Ms. Kiernan caused
17  you to suffer emotional distress?
18   A   Clarify that.
19   Q   I don't know if I can be any more clear.
20       Has any medical professional told you that
21  your encounter with Louise Kiernan caused you
22  emotional distress?
23   A   I know that it caused me emotional distress.
24   Q   And that's not my question respectfully.

Page 99

1        Has any medical professional given you
2  their opinion that your interaction with Louise
3  Kiernan caused you emotional distress?
4    A   I didn't ask for their opinion.
5    Q   So the answer to my question is no, no
6  medical professional told you that, correct?
7    A   Well, she didn't say yes.  She didn't say no.
8    Q   My question, sir, no medical professional has
9  informed you that your interaction with Ms. Kiernan
10  caused you emotional distress, correct?
11   A   Well, my emotional distress is caused because
12  of this situation right here that I'm currently in.
13  I did not have a history of any kind of emotional
14  issues prior to this.
15   Q   Sir, I just please ask you to listen to my
16  question respectfully.  I'm asking you about your
17  conversations with medical professionals.
18       Has any medical professional opined that
19  your interaction with Ms. Kiernan caused you
20  emotional distress?
21   A   Well, I didn't ask them that question, if I
22  thought it was their opinion, so I can't answer that.
23   Q   So the answer is no, no medical professional
24  has told you that?

Page 100

1    A   The answer is I can't give you the answer
2  you're looking for because I didn't ask them that
3  question, Jonathan.  If I had asked that question I
4  would have an answer.
5    Q   I'm asking about what they said to you not
6  whether you've asked the question.
7        So no medical professionals told you that,
8  correct?
9    A   I don't recall.
10   Q   Okay.  Has any medical professional ever
11  stated at any time that your interactions with anyone
12  at ProPublica caused you emotional distress?
13   A   I don't recall.
14   Q   Now, we've discussed your interactions with
15  Ms. Kiernan.  They occurred in April -- strike that.
16       You had an in-person interaction with
17  Ms. Kiernan in May, correct, a one-minute interaction
18  with her in May of 2017?
19   A   It was a minute and a half, could have been
20  two minutes.
21   Q   And you e-mailed with her in April, correct?
22   A   Prior to that.
23   Q   And you're claiming that these instance --
24  strike that.

Page 101

1        You're claiming that these communications
2  caused you emotional distress in this case, is that
3  right?
4    A   It's the totality of everything that has
5  happened.  It wasn't just that particular -- you're
6  trying to focus in on that one interaction.  It's the
7  totality of everything that has happened since then.
8  It's all working together.
9    Q   That interaction I'm talking about is the
10  only interaction you've ever had with ProPublica
11  personnel, correct?
12   A   That is correct.
13   Q   Okay.  You did not notice any change in your
14  behavior or habits until the winter of 2018, correct?
15   A   Is that what I said?
16   Q   I'm asking you that question, is that
17  correct?
18   A   I would have to -- I would have to see what I
19  put in my notes.
20   Q   Okay.
21   A   So can you take me to that page.
22   Q   Yeah, let's look at Exhibit 2.  Do you have
23  it in front of you, sir?
24   A   Yes, I do.

Page 102

1   Q   Page 3 of Exhibit 2, are you with me?
2   A   Yes, I am on Page 3, that is correct.
3   Q   Okay.  Your response to request for
4  production No. 11 reads as follows, quote, when I
5  first noticed that my behavior and habits were
6  starting to change in the winter of 2018, I reached
7  out to my PCP to seek help.  Do you see that?
8   A   Yes, that is correct.
9   Q   And you certified that this is correct when
10  you signed the document on the last page, correct?
11   A   Yeah, that is correct.
12   Q   So this was after your EEOC claim had been
13  investigated and dismissed that you noticed
14  behavior -- strike that.
15       This is after your EEOC claim was
16  dismissed that you noticed changes in your behavior,
17  correct?
18   A   Yes.
19   MR. BLAKLEY:  Okay.  Let's mark another exhibit.
20       (Whereupon Deposition Exhibit 16 was
21        marked for identification.)
22  BY MR. BLAKLEY:
23   Q   Mr. Hare, what's been marked as Exhibit 16
24  and just handed to you is a letter dated April 16th,

Page 103

1  2018, that you authored to Gregory T. Mucha,
2  M-u-c-h-a, an EEOC investigator.
3   A   That is correct.
4   Q   Do you recognize this document?
5   A   Yes, I do.
6   Q   Look at Page 4 of the letter, sir, and the
7  second to last paragraph reads as follows, quote,
8  therefore, I humbly ask the EEOC and its
9  commissioners to issue a right to sue letter.  There
10  is only one way to rightfully determine who was the
11  best candidate for the job and that is to do a
12  side-by-side comparison in a court of law.  Do you
13  see that?
14   A   Yes.
15   Q   Have you reviewed the credentials of the
16  reporters that ProPublica Illinois hired in 2017?
17   A   Have I reviewed them?
18   Q   Yes.
19   A   What do you mean by that?
20   Q   Have you looked at the backgrounds of the
21  reporters that ProPublica hired in 2017?
22   A   And how would I know their backgrounds?
23   Q   I'm asking you yes or no if you looked at
24  them?

Page 104

1   A   I don't specifically recall looking at their
2  backgrounds.
3   Q   Okay.  Well, I can tell you that each of them
4  have formal journalism education, each of them have
5  received awards for their work and each of them has
6  years of experience in investigative reporting.
7   A   I understand that, but ProPublica didn't
8  hire -- in Illinois they didn't hire one black
9  reporter even though there's some belief that there
10  are 42 that had applied.
11   Q   So you don't believe that ProPublica was
12  justified in hiring those reporters instead of you,
13  is that correct?
14   A   I didn't say that.
15   Q   Okay.  So if the five reporters that
16  ProPublica Illinois hired all have more experience,
17  all have won awards, all have formal journalism
18  education, ProPublica was right to hire them instead
19  of you, is that right?
20   A   That's the decision that they made.
21   Q   Okay.  That wasn't my question.  You wrote in
22  this letter that you want to compare your credentials
23  to the people they hired to determine who is the best
24  candidate.

Page 105

1       If the individuals that ProPublica
2  Illinois hired, again, have years of investigative
3  reporting experience, if they have years of formal
4  journalism education and have won awards for their
5  work, were they justified in hiring these people who
6  are better candidates?
7   A   Well, I don't necessarily agree with that
8  because, like I said, they didn't hire any black
9  reporters whatsoever and the only way to find out
10  would be to do a side-by-side comparison of everyone
11  not just the five that they hired.  That's why I
12  asked the EEOC to expand the investigation.  Let's
13  look at everybody.  Put all the cards on the table
14  and let's see what it looks like.
15   Q   You believe that ProPublica was required to
16  hire a black reporter?
17   A   They said that's what they were looking for
18  in their advertisement.
19   Q   That's not what I asked.
20       Do you believe they were required to hire
21  a black reporter?
22   A   I took them at their word just like I
23  believed all of their other stories that they wrote
24  down.  So if they said that they were looking for

Page 106

1  reporters that reflected the communities that they
2  cover and they do cover the black communities, what
3  else am I to think? What other conclusion could I
4  come to?
5      Q   Do you believe that ProPublica Illinois was
6  required to hire a black reporter?
7      A   Based on the advertisement that I read, yes.
8      Q   Okay. Now, if there was a black reporter
9  that applied that had more credentials than you,
10  should ProPublica have hired that reporter?
11     A   That would be a decision that's totally up to
12  them, but under that example they didn't hire one.
13  They didn't hire any black reporters out of 42.
14     Q   Do you believe that you are as well qualified
15  as the five individuals that I just discussed?
16     A   Based on what I had read in the
17  advertisement, yes, I strongly believe I qualified.
18     Q   Do you believe you are a better candidate
19  than the five individuals --
20     A   Based on the advertisement that I read, yes,
21  and I don't know the background of those other five
22  reporters.
23     Q   Okay.
24     A   I was just going by what the advertisement

Page 107

1  stated.
2      Q   Which advertisement are you referring to,
3  sir?
4      A   Let's see which exhibit. So one is
5  Exhibit 9, and what's the other exhibit, Jonathan?
6      MS. WILLIS: Possibly 12.
7      THE WITNESS: Okay. This is what it said. We
8  are looking for reporters with a track record of
9  aggressive, resourceful, original reporting. I did
10  that. A gift for weaving revelatory findings into
11  authoritative, powerful narratives. I did that. A
12  willingness to embrace different blends of
13  storytelling from traditional long-reads to audio to
14  whatever may emerge next on the social web. I did
15  that. A documented commitment to collegiality and
16  collaboration.
17          These were the only four requirements that
18  they posted, and they went on to say even if you
19  thought blah, blah, blah, blah, blah, apply. They
20  didn't mention anything about awards. They didn't
21  mention anything about years of education or formal
22  journalistic training. They didn't mention anything
23  like that.
24

Page 108

1  BY MR. BLAKLEY:
2      Q   Okay. So you believe that these
3  characteristics listed in this February 21st, 2017
4  posting are job requirements or qualifications?
5      A   This is what they posted.
6      Q   I'm asking you a different question. I know
7  they posted it.
8          Are these four bullet points job
9  requirements or qualifications to your knowledge?
10     A   This is what they said that they were looking
11  for.
12     Q   Okay. Now, my other question was about your
13  letter to Greg Mucha. The five candidates that they
14  hired are more experienced, have awards and have
15  journalism education. Would you agree that those are
16  better candidates for the job?
17     A   I totally disagree. That was after the fact.
18  I can't go by what happened after the fact. This is
19  what I was responding to. This is what drew me in.
20  This spoke to my heart. The groundbreaking series
21  about the Fraternal Order of Police contract, no
22  other news organization had even wrote about the
23  Fraternal Order of Police contract not until I broke
24  that story.

Page 109

1      Q   You said no other news organization had
2  written about that, correct?
3      A   They did not go into no details about the
4  contract.
5      Q   You said the same thing in your letter to
6  Louise Kiernan on April 24th, 2017, isn't that right?
7      A   I believe so.
8      MR. BLAKLEY: Okay. Let's mark that as an
9  exhibit.
10          (Whereupon Deposition Exhibit 17 was
11          marked for identification.)
12  BY MR. BLAKLEY:
13     Q   Mr. Hare, what's been handed to you and
14  marked as Exhibit 17 is a letter dated April 24th,
15  2017, that you authored and e-mailed to Louise
16  Kiernan, is that correct?
17     A   Yes, that is correct.
18     Q   Okay. The third paragraph of the letter
19  reads as follows, quote, this is the middle of the
20  paragraph, in January 2016 I wrote a three-part
21  series examining why it's so difficult disciplining
22  Chicago police involved in civilian shooting and/or
23  accused of excessive use of force. I actually read
24  the 160-page FOP contract and highlighted certain

Page 110

1  provisions that appeared to give cover to the police
2  thus circumventing discipline. The Defender was the
3  first newspaper to our knowledge to delve into and
4  publish some of the details of the contract.
5       Do you see that language?
6  A  Yes.
7  MR. BLAKLEY: Now we'll mark as Exhibit 18 the
8  Fraternal Order of Police article that you authored
9  for the Defender, Part 1 of 3.
10      (Whereupon Deposition Exhibit 18 was
11       marked for identification.)
12 BY MR. BLAKLEY:
13 Q  Do you recognize this, sir?
14 A  Yes, I do.
15 Q  And this is Part 1 of the three-part series
16 you reference in your letter, correct?
17 A  Yeah, that is correct.
18 Q  And it's also one of the stories that you
19 describe as groundbreaking in the audio clip on your
20 blog?
21 A  Yes.
22 Q  And it was published on January 7th, 2016,
23 correct?
24 A  I believe so, yes.

Page 111

1  MR. BLAKLEY: And let's mark as Exhibit 19
2  another document.
3       (Whereupon Deposition Exhibit 19 was
4        marked for identification.)
5  BY MR. BLAKLEY:
6  Q  Mr. Hare, what's been marked as Exhibit 19
7  and handed to you is a Chicago Reporter article dated
8  December 10th, 2015, do you see that?
9  A  Yes, I do.
10 Q  And it's authored by Adeshina Emmanuel of the
11 Chicago Reporter, do you see that?
12 A  Yes, I do.
13 Q  On Pages 2 of 3 of the exhibit he discusses
14 the FOP contract and contract performed, does he not?
15 A  Well, I haven't read this article. This is
16 the first time I've seen this.
17 Q  Well, I'm representing to you that he does
18 discuss those things on Page 2 of 3 of Exhibit 19,
19 and again, this is dated December 10th, 2015.
20 A  Okay.
21 MR. BLAKLEY: I'll also mark another exhibit.
22      (Whereupon Deposition Exhibit 20 was
23       marked for identification.)
24

Page 112

1  BY MR. BLAKLEY:
2  Q  Actually, before we get to that exhibit, I
3  want to point you again to Exhibit 18, your own
4  article.
5       Isn't it true that you cite Mr. Emmanuel's
6  article in your Chicago Defender article?
7  A  Where is that? What page are you on?
8  Q  I'm asking you if you did that or not, sir?
9  A  I'm asking you what page are you on?
10 Q  Do you recall citing his article in your
11 article?
12 A  Where at in my story, Jonathan, are you
13 referring to?
14 Q  I'm asking if you recall doing it? Do you
15 recall doing it, sir?
16 A  I'm looking through. I'm reading through it.
17 Can you point to me.
18 Q  Page 3 of your article, sir. City Council
19 Bought Bill of Goods, that section. It says, quote,
20 Dean Angelo, the FOP's current president, stated in
21 an interview taken from the Chicago Reporter with
22 Adeshina Emmanuel that he wondered why aldermen were
23 complaining about an FOP contract that they
24 themselves approved. Do you see that?

Page 113

1  A  You said Page 3?
2  Q  Page 3 of the exhibit, sir.
3  MS. WILLIS: Which line are you on? I didn't see
4  that.
5  MR. BLAKLEY: Oh, Page 4, I'm sorry. City
6  Council Bought Bill of Goods.
7  THE WITNESS: Okay, yeah, I see it.
8  BY MR. BLAKLEY:
9  Q  Also on Page 3 under the Who Represented The
10 People section, the second quoted area says, quote,
11 police misconduct could cost the city millions with
12 there being no repercussions for you as an individual
13 officer. That disconnect I found it troubling then
14 and I find it troubling now Piers said in an
15 interview with the Chicago Reporter. Do you see
16 that?
17 A  Yes, I do see that.
18 Q  Okay. Now, looking at Exhibit 20 that I just
19 handed to you, this is an article authored by Brandon
20 Patterson of Mother Jones dated December 17th, 2015.
21 Do you see that?
22 A  Yeah, I see that.
23 Q  And I can tell you that Mr. Patterson
24 discusses the FOP contract on Pages 2 through 4 of

Page 114

1  the exhibit.  Do you see that, sir?
2      A   Yes, I do.
3      Q   Okay.  So despite what you wrote in your
4  introductory letter, you were not the first reporter
5  to analyze the FOP contract, correct?
6      A   Well, these are not Chicago reporters.
7      Q   I'm sorry?
8      A   I mean, I'm sorry, these were not the
9  mainstream media reporters that I had referenced.
10     Q   Okay.  So when you wrote that no other outfit
11 had done this, you specifically meant to omit the
12 Mother Jones article and the Chicago Reporter
13 article?
14     A   No, that's not what I -- no, I was not
15 omitting this if I put it in the story.
16     Q   When you were initially hired at the
17 Defender, you weren't initially hired as a reporter,
18 were you?
19     A   That is correct.
20     Q   What were you initially hired to do?
21     A   I did some editorial work for the lifestyle
22 magazine.
23     Q   So when did you first start reporting?
24     A   It was around the fall of 2015.

Page 115

1      Q   Okay.  So you started in January of 2015 and
2  did not start reporting until maybe eight or nine
3  months later?
4      A   Yeah, I did from January up until I got hired
5  as a reporter I worked on the lifestyle magazine
6  doing editorial work.
7      Q   Now, you also --
8      A   Which was an offshoot of the newspaper.
9      Q   Now, you also mention that after you stopped
10 working at the Defender you continued to work on
11 stories, is that correct?
12     A   Yes.
13     Q   Were any of these published?
14     A   I haven't published them on my blog yet.
15     Q   Okay.  Lastly I'll note that we have some
16 pictures here that you brought to the deposition.
17 Can you explain who these people are.
18     A   Yes, that's my mother on your left, Juanita
19 Hare, and that's my father Raleigh Hare on the right.
20     Q   And why did you bring these pictures to the
21 deposition?
22     A   Well, those are my guardian angels.  Those
23 are my ancestors.
24     Q   Understood.

Page 116

1      A   My mother had actually left the South because
2  she did not want to work on a farm picking cotton
3  when she was a teenager.  She left the South to come
4  here for a better life.
5      Q   I understand.
6          In your discussions with Michael Grabell,
7  did he ever mention your race at all?
8      A   No.
9      Q   Ever mention your skin color?
10     A   No.
11     Q   Did he ever mention your age?
12     A   No.
13 MR. BLAKLEY:  Mr. Hare, I think that's all the
14 questions I have for you at this time.  Thank you.
15 MS. WILLIS:  Okay, I have some questions.
16                 EXAMINATION
17 BY MS. WILLIS:
18     Q   Mr. Hare, you mentioned at the beginning of
19 this deposition that you were at least occasionally
20 using medication?
21     A   Yes.
22     Q   Why was the medication prescribed and when?
23 MR. BLAKLEY:  I'll object to the form and
24 foundation.

Page 117

1  BY MS. WILLIS:
2      Q   Okay.  You were taking medication that you
3  said started with an S and you thought it was --
4      A   Sertraline.
5      Q   I've heard of Sertraline.
6      A   Sertraline or something like that.
7      Q   When was that prescribed?
8      A   That was prescribed in August of last year,
9  end of August, beginning of September.
10     Q   2019?
11     A   Yeah, of 2019, that is correct.
12     Q   Okay.  And for what purpose?
13     A   It was for the purpose of depression to help
14 me with my symptoms.  I wasn't eating.  I was
15 sleeping.  I was withdrawn, so I was experiencing
16 symptoms of depression.
17     Q   And who prescribed it?
18     A   This is Dr. Regina Hall.
19     Q   Okay.  What kind of discussion did you have
20 with Dr. Hall that led to that prescription?
21     A   Well, I told her what happened, what I was
22 currently going through.
23     Q   Which was what?
24     A   That I was suing this news organization

Page 118

1  ProPublica for age, race and color discrimination,
2  and then after, you know, once the process got
3  underway, I started -- my behavior started changing,
4  you know, my patterns.
5      Q   How so?
6      A   Well, I was becoming more withdrawn.  I was
7  sleeping.  I wasn't eating.  I was --
8      Q   Did Dr. Hall give you a diagnosis?
9      A   Yeah, she said that all of the symptoms were
10  classic symptoms of depression.
11      Q   So the medication is for depression?
12      A   Yeah, amongst other things, yeah.
13      Q   Have you previously had any medication for
14  depression?
15      A   No, no, I don't have a medical history with
16  any kind of psychological or any other kind of
17  issues.
18      Q   Okay.  So the litigation here is the
19  foundation for that?
20      A   Yes, in my mind the litigation definitely has
21  impacted my overall health in a big way, yes.
22      Q   Okay.  Do you continue to see Dr. Hall?
23      A   I had a follow-up appointment which I did
24  not -- after they sent the subpoena I did not, no.  I

Page 119

1  haven't seen her to follow up.
2      Q   Okay.  So you indicated that once the
3  prescription was given you stopped driving for Lyft?
4      A   Yeah, when I started taking it and started
5  experiencing those terrible symptoms, yes, I stopped.
6      Q   Okay.  Did you resume the use of the
7  medication?
8      A   Yeah, I did resume the use of the medication
9  but I cut it in half when I started driving for like
10  Uber.
11      Q   So when you started driving for Uber, how did
12  you manage the medication along with that driving
13  responsibility?
14      A   It was on and off.
15      Q   How so?  Can you elaborate on that?
16      A   The days where I was driving I wouldn't take
17  the medication, and I would flush the days -- yeah,
18  the days I wasn't driving, I wouldn't take the -- the
19  days that I was driving I wasn't taking the
20  medication.  The days where I was taking the
21  medication that I had cut in half to try to manage
22  the symptoms, I wouldn't, you know.
23      Q   So let's say, for example, if you had
24  medication today, would you drive today?

Page 120

1      A   No.
2      Q   If you had it today, would you drive
3  tomorrow?
4      A   Only if I had, you know, flushed my system
5  out, if I felt that it was safe, but I would try to
6  wait to make sure that I wasn't feeling those
7  different kind of symptoms and stuff.
8      Q   What do you mean by flush your system?
9      A   I would drink a lot of water, a lot of water.
10      Q   Okay.  And then you feel the symptoms would
11  disappear, dissipate?
12      A   Yeah, they would dissipate, yeah.
13      Q   Okay.  When you first met with Mr. Grabell,
14  what was that discussion about in terms of a position
15  with ProPublica?
16      A   Well, I had told him, I asked him -- I knew I
17  had missed the deadline and I asked him were they
18  still hiring and he said yes, that they were still
19  hiring.
20      Q   So did he provide you with information about
21  how to contact Ms. Kiernan?
22      A   After I had e-mailed him and he forwarded it,
23  either he gave it to me or I looked it up online.  I
24  don't quite recall, but yeah, it's either he gave it

Page 121

1  to me or I looked it up online.
2      Q   So the first time, your first contact with
3  Ms. Kiernan was via e-mail?
4      A   Yeah, that is correct.
5      Q   Was it a job application?
6      A   No, it was -- in my mind it was an inquiry to
7  find out if there was any possibility for me to move
8  forward with an application.
9      Q   And the inquiry consisted of what?
10      A   Well, it consisted of a letter of
11  introduction.  I had a couple of JPEGs and some audio
12  from a WVON commentary.
13      Q   And you hoped this would do what?
14      A   Have her take a look and then give me some
15  information to move forward with an application which
16  I did not receive.
17      Q   So she did not respond to your inquiry?
18      A   No, no, I think she responded.  She responded
19  I think to the e-mail that Michael had sent her.
20      Q   Did Mike forward that response on to you?
21      A   She sent it to me directly, I believe.
22      Q   Okay.  And why did you want to apply to
23  ProPublica?
24      A   Well, again, the advertisement I believe I

Page 122

1  fit those requirements, those four requirements,
2  hard-hitting investigative news, able to work with
3  other people, collaborative and, you know, those four
4  simple requirements in my mind which I had met in my
5  mind.
6     Q    Now, you mentioned that prior to this
7  application and prior to meeting Mr. Grabell you had
8  been basically reading ProPublica materials?
9     A    Yes, I had.
10    Q    What was your impression of ProPublica?
11    A    I thought they were a good news organization,
12 but I didn't know at that point in time the racial
13 demographics of their newsroom because at the time
14 when I was reading them I wasn't involved.
15    Q    What types of articles attracted your
16 attention?
17    A    Well, they did one specifically they did an
18 exposé on the Red Cross had collected almost a half a
19 billion dollars in aid after the Haiti earthquake,
20 and the money never did go to who it was supposed to
21 go to.  It was supposed to help the people rebuild
22 the country, but ProPublica had did an exposé and
23 they found out that the money -- very few money went
24 to the people.  I think maybe six or seven houses had

Page 123

1  been built out of that half a billion dollars that
2  had been raised, and it was that kind of
3  investigative reporting that I was drawn to.
4     Q    So based on the investigative reporting that
5  you viewed two to three years before applying, did
6  you believe there was a diverse journalistic staff?
7     A    Well, it never crossed my mind, but in New
8  York City, yes, I would have -- a news organization
9  coming out of New York City you would expect them to
10 have a much more diverse news force.  They cover a
11 lot of issues dealing with the black community, but
12 out of nearly 90 reporters, they only have three
13 black reporters in New York City.  That's unheard of.
14 So for ten years and counting just three.
15    Q    So you did your own sort of investigation
16 into the racial composition of the staff?
17    A    Yes.
18    Q    How recently was that?
19    A    How recently?
20    Q    How recently did you do that investigation?
21    A    After -- it was in the fall.
22    Q    Fall of?
23    A    Fall of 2017.  When I didn't hear from
24 anybody I started digging, and that's when all of

Page 124

1  this started, information started materializing that,
2  hey, there appears to be a problem here.
3     Q    So you applied to ProPublica.  Is this
4  through Screendoor?
5     A    That is correct.
6     Q    And when you applied was there any message to
7  you that they would get back to you?
8     A    Yeah, there was a confirmation e-mail and
9  they said something to the effect that we'll get back
10 to you and then I never heard anything else after
11 that.
12    Q    And so when you didn't hear anything after
13 they promised they'd get back to you, you did the
14 investigation yourself?
15 MR. BLAKLEY:  Object to form specifically to the
16 use of promise.
17 BY MS. WILLIS:
18    Q    So you did the investigation on your own?
19    A    Yes.
20    Q    And you looked at the New York office?
21    A    Yeah, I started looking at the racial makeup
22 of the reporters that are listed online on the New
23 York website.
24    Q    And you found that they were lacking?

Page 125

1     A    They were very lacking.
2  MR. BLAKLEY:  Object to form.
3  THE WITNESS:  There was only one black male
4  reporter and there was one black female at that time
5  since at that particular point in time, one or two.
6  BY MS. WILLIS:
7     Q    Okay.  Were they journalistic reporters?
8     A    Yeah, they were writers, yeah.
9     Q    Did you look into ProPublica Illinois?
10    A    Yeah, I did.
11    Q    What did you find?
12    A    I found that despite their advertisement that
13 they wanted to hire people that reflected the
14 communities that they cover, there were no black
15 reporters on that photo that Louise had posted to her
16 Twitter account.
17    Q    Okay.  And that caused concern for you?
18    A    That was a concern.  That was a huge concern.
19    Q    Okay.
20    A    There weren't even any black reporters in her
21 classroom that she taught at Northwestern University,
22 none that I could tell because there were photos from
23 her Northwestern University classroom and field
24 trips, and there was no black student journalistic

Page 126

1  students in her class at Northwestern, so it started
2  pointing to a pattern in my mind.
3      Q   So what piqued your interest in pursuing
4  journalism?
5      A   I've always had a knack for telling stories,
6  digging out the facts, asking questions that other
7  people may not want to answer or are afraid to ask.
8      Q   Did you think that your paralegal experience
9  with the Glover Law Office tied into your later
10  experience with the Defender?
11      A   Oh, yeah, it definitely had a huge impact,
12  made a difference.
13      Q   How so?
14      A   Because when you're asking questions to find
15  out what are the circumstances that brought you to
16  this point, you know, why are you here, what are you
17  trying to accomplish, what are you trying to -- what
18  grievances or circumstances are you trying to
19  address, what rights -- what wrongs are you trying to
20  right, and so all of that was just a perfect shoo-in
21  for the job at the Chicago Defender.
22      Q   Okay.  So subsequent to your position at the
23  Defender and after your application for the
24  investigative position at ProPublica, did you feel

Page 127

1  that you were lacking as a result of your educational
2  background?  Did you feel that that was a priority?
3      MR. BLAKLEY:  Object to the form.
4      THE WITNESS:  No, no, I didn't feel as though I
5  was lacking.
6  BY MS. WILLIS:
7      Q   Did ProPublica indicate they were looking for
8  award winning experienced journalists?
9      A   No, they didn't.
10      Q   Did they say that your educational background
11  was a priority in their selection process?
12      A   It was not mentioned anywhere in the
13  advertisement.  It wasn't.  They even went on to
14  say -- they had this one line that said something
15  about they really went out of their way to try to
16  encourage people in underrepresented communities to
17  apply, and after everything played out and I'm
18  looking back, I'm like this is not the truth.  This
19  is a lie.  That's not -- nothing could be further
20  from the truth.
21      Q   Okay.  I think that was in the exhibit,
22  Exhibit 9 and Exhibit 12.
23          Do you have Exhibit 9?
24      A   Yeah, I do have Exhibit 9.

Page 128

1      Q   Okay.  So what did you see in Exhibit 9 that
2  led you to believe that your background and
3  experience would be appropriate for ProPublica?
4      MR. BLAKLEY:  I'll just object.  I think this has
5  been asked and answered.  You can go ahead and answer
6  again, Mr. Hare.
7      THE WITNESS:  It says in the advertisement, as
8  part of our team you will take on ambitious,
9  compelling stories designed to surprise, reveal,
10  inform and bring about change, and that's exactly
11  what the stories that I had wrote at the Chicago
12  Defender that's what they did.
13  BY MS. WILLIS:
14      Q   Okay.
15      A   The three-part series, one of the readers had
16  started an online petition when the Chicago -- when
17  the FOP and the Chicago Police Department had sued
18  the City of Chicago for a violation of the FOP
19  contract.  They had a portion of what was called
20  complaint registers.  Those are complaints against an
21  officer involved in an excessive force or whatever
22  the case may be.  In the contract it said those files
23  are supposed to be destroyed after five or seven
24  years depending upon the nature of the complaint.

Page 129

1  Well, the City of Chicago never, ever destroyed those
2  files.  So, therefore, the FOP took the city to court
3  to destroy those files, and that was going on at the
4  time that I was writing this story.  One of the
5  readers found out about it and he started an online
6  petition that went to the city with 30,000 signatures
7  to save those police records from being destroyed.
8      Q   Okay.  In the ProPublica hiring notice for
9  ProPublica Illinois, would you read this paragraph.
10      A   It says, most importantly though we want to
11  hire journalists who bring a diversity of
12  experiences, talent and viewpoints to their work.  So
13  if you don't think you can check off every box on the
14  list above but are confident you can contribute to
15  our efforts, please don't hesitate to apply.
16      Q   And that's what you did, correct?
17      A   Yeah, that's what I did.
18      Q   Okay.
19      A   But all of a sudden now they want to bring in
20  years of experience, award winning, and if that's the
21  case, why didn't you just say that upfront.  So
22  that's the hypocrisy that I'm talking about.  This is
23  a hypocritical newsroom.  They can expose everybody
24  else's wrongdoing, everybody else's racism, everybody

Page 130

1  else's corruption but then when it comes to them,
2  they can't find documents, we don't have this or
3  that, but we have something similar to that we can
4  take a look at. I mean, it's incredulous. If you
5  are considering yourself to be the moral authority of
6  journalism then be that. Be it all the way though
7  not cherry-pick when you're going to do it and when
8  you're not going to do it because this is in my
9  opinion a bunch of bullshit. It's a bunch of
10  bullshit and you know that.
11      Q  Do you feel that lacking awards and years of
12  education in journalism puts you at a disadvantage in
13  this job application process?
14      MR. BLAKLEY: I'll object to the foundation.
15      THE WITNESS: Do you want me to answer that
16  question?
17      MS. WILLIS: Yes, still answer.
18      THE WITNESS: No, it doesn't put me at a
19  disadvantage because that's not what they asked for.
20  BY MS. WILLIS:
21      Q  So if you were being compared to a candidate
22  that came out of Northwestern's school of journalism
23  that won several awards of journalism, do you feel
24  that your background and experience would be

Page 131

1  competitive?
2      A  If we look at the stories irregardless of the
3  background, the stories and the results that follows,
4  you would have no idea, no idea, and provided that
5  I'm given the same resources that those other people
6  are given, the same support, there would be no
7  difference. There really would be no difference in
8  our work.
9      Q  Okay. So diversity to you is important in
10  journalism?
11      A  Diversity is very important. It's extremely
12  important otherwise you'd have people that are
13  outside of the community controlling the narrative of
14  the black community, and that's exactly what's going
15  on at ProPublica.
16          For example, in a lot of the stories that
17  they talk about the black community, they always have
18  an a dark-skinned black person in the photo. You
19  hardly ever see a light-skinned black person. So if
20  I was a foreigner or an alien from another planet and
21  I came to Chicago or New York City and ProPublica was
22  the only source of my news, I would think that all
23  dark-skinned people were horrible, wretched, poor,
24  broken down. I would be terrified based on

Page 132

1  ProPublica's characterization.
2      Q  So are you indicating based on what you're
3  saying that someone who looks like you would be that
4  characterization?
5      A  Absolutely. Absolutely. This foreigner
6  coming into Chicago or New York if they saw me
7  walking down the street, they wouldn't think any
8  different of me than the people that they read about
9  in ProPublica's editorials, and that's dangerous.
10  That's a very dangerous precedent to set.
11      Q  Let's get to this meeting with Louise
12  Kiernan.
13          You talk about the nonverbal, the
14  nonverbal behavior.
15      A  Oh gosh, man.
16      Q  Was there someone else who commented to you
17  at all about what they observed?
18      A  Oh, absolutely.
19      Q  Who was that?
20      A  Kai was with me, Kai El Zabar. She was the
21  former executive editor at the Chicago Defender. She
22  observed what was going on.
23      Q  She was how far away from the two you?
24      A  She wasn't too far. She was close enough to

Page 133

1  see the body language and everything that was going
2  on, and when I came over to her, she asked me how did
3  it go, and I told her I didn't think it went well and
4  then she agreed with me just based on what she had
5  observed.
6      Q  Did she say anything further than I agree?
7      A  I don't recall if she said anything specific.
8      Q  But she agreed?
9      A  Yeah, she knew that something was amiss with
10  that encounter.
11      Q  Okay. And are you saying that you saw a
12  different interaction between you and Ms. Kiernan and
13  Ms. Kiernan and others?
14      A  Night and day. Night and day. There's no
15  mistake about it. Night and day. Night and day.
16  Night and day.
17      Q  Did you observe any interaction between
18  Ms. Kiernan and any other people of color?
19      MR. BLAKLEY: I'll object. This has been asked
20  and answered and discussed ad nauseam.
21      MS. WILLIS: We didn't talk about her interaction
22  with people with color.
23      THE WITNESS: There was -- Natalie was there from
24  WBEZ.

Page 134

BY MS. WILLIS:

Q   And this is a black female?

A   Yeah, she's a black female.  She was the only black female reporter on the stage doing this ethics speaking, and she was real cool with Natalie but she had a problem with me for some odd reason.

Q   And in that picture that you noticed that she posted on the website, did you see any males?

A   No, there were no black males.  There were no black females.  There were no black people.

Q   Were there any males of any background?

A   Yeah, there were males of other backgrounds, yeah.

Q   So did you have a sense there was a preference for female journalists?

MR. BLAKLEY:  Object to the form and foundation.

THE WITNESS:  There was in my opinion a preference.  Everybody looked young-ish, like under 40 or so, and everybody was white skinned or fair skinned.  There was nobody that looked like me.

BY MS. WILLIS:

Q   Okay.

A   And that caught my attention.

Q   So based on the visual and based on the

Page 135

nonverbal?

A   Based on the visual and based on the nonverbal, that is correct.

Q   So where is the conclusion about Ms. Kiernan being a liar coming from?

MR. BLAKLEY:  Objection, asked and answered.

THE WITNESS:  Well, she told the federal investigator that I had applied to her private e-mail server which I did not.  I had sent a letter of inquiry and I had sent several links to some stories I wrote and then I had also sent some audio just to, you know, encourage her to respond, to respond to me, and I never did hear anything.

BY MS. WILLIS:

Q   To your understanding an application would have been what?

A   Well, a resume, a job history.  That's what I would consider a resume.  I don't think if I walked into your office -- I don't think that if I walked into your office and gave you a letter of introduction that you would consider that an application without knowing anything about my background, my work history.  That just doesn't make any sense.

Page 136

Q   So the only applications to ProPublica were through their Screendoor process?

A   Yes, that is correct.

Q   Okay.

A   Yeah, Screendoor.

Q   Okay.  And how would you describe your experience with the Defender?

A   It was an incredible experience.  Although it was only a brief two years, it was incredible, and there were a lot of changes going on not only in the city but with the newspaper itself, but it was a very positive experience.  It's one that I'll never forget, and I'm ever so grateful that they gave me the opportunity to make a difference in the city that I grew up in and was raised in.

Q   And how would you distinguish the Chicago Defender publication from a ProPublica publication?

A   Well, Chicago Defender initially it was -- it had a reach that was worldwide, so initially it was really no different than ProPublica, and they were really at one point a very powerful news organization.  You couldn't make it to the White House without their endorsement back in the '50s if I'm not mistaken, and that was a lot of power.  So it

Page 137

really wasn't that different as far as their reach was concerned.  The difference is the news tends to focus on the aspects of black life and black culture.

Q   Is that contrary to what ProPublica's focus is?

MR. BLAKLEY:  Object to the foundation.

THE WITNESS:  They write about black life and black culture too all the time.  They just don't have black reporters doing it.

BY MS. WILLIS:

Q   All right.  Let's see.

Now your blog, I think you previously indicated that the blog was just to get some of your ideas out.  Your blog as I understand it did you say it was not generated for the purpose of attacking ProPublica?

A   Oh, no, that was done way before.  That was done way before, and I wanted to continue writing and publishing my own stories, stories that I thought were relevant to all of Chicagoland and the black community as well.

MS. WILLIS:  I'm done, Jonathan.

MR. BLAKLEY:  All right.

Page 138

1    FURTHER EXAMINATION
2  BY MR. BLAKLEY:
3      Q   Mr. Hare, just really quickly, you talked
4  again about the February 2017 advertisement and you
5  went through the bullet points and believed that you
6  met all of them, is that right?
7      A   Yeah, the four that they had.  The four
8  qualifying factors, that is correct.
9      Q   What you describe as qualifying factors,
10 because you believe that you met all of them, do you
11 believe that you were entitled to be hired by
12 ProPublica Illinois?
13     A   Entitled?  What do you mean by entitled?
14     Q   Do you believe that because you met those
15 four that ProPublica Illinois had to hire you?
16     A   I believe that I met those qualifications.
17 That's what I believe.
18     Q   That's a different question.  Because you
19 believe you met those qualifications, do you believe
20 that ProPublica Illinois was required to hire you?
21     A   They should have hired me.  I gave them what
22 they were looking for.
23     Q   Okay.  So if they received 250 applications
24 and all of these people meet all four qualifications,

Page 139

1  were they required to hire all 250 people?
2      A   Now that's a different question.  If you only
3  have a limited amount, but they didn't hire any
4  blacks.
5      Q   That's not my question.  Were they required
6  to hire all 250 people respectfully?
7      A   How could you -- if they had 250 positions
8  open.
9      Q   So the answer to my question is no, correct?
10     A   That's what you're saying.  It doesn't make
11 any sense to me.  Your question doesn't make any
12 sense to me.
13     Q   My question doesn't make sense?
14     A   No, it doesn't make sense not in this
15 context.  I'm here because they did not hire any
16 black reporters, none whatsoever, none.
17     Q   That's why you're here because they didn't
18 hire any black reporters, not because they didn't
19 hire you?
20     A   That's not what I'm saying.
21     Q   What are you saying, sir?
22     A   I'm saying I met these qualifications.  I
23 believe that I met these qualifications, and I still
24 do believe that I met those qualifications.  That's

Page 140

1  what I'm saying.
2      Q   And do you believe that because you met those
3  bullet points, I would not characterize them as
4  qualifications --
5      A   What do you consider those to be?  Put
6  yourself in my position.  Would you consider these to
7  be bullet points or hiring requirements?  This is a
8  solicitation to hire, Jonathan.
9      Q   Because you believe that you met those four
10 bullet points, do you believe ProPublica Illinois was
11 required to hire you?
12     A   What do you mean by required?
13     Q   Because you met them, if they didn't hire you
14 that means they discriminated against you, is that
15 what you're saying?
16     A   They definitely discriminated against not
17 only me but all the black reporters.
18     Q   Because they didn't hire you.  They
19 discriminated against you because they didn't hire
20 you?
21     A   They discriminated against me.
22     Q   You?
23     A   Yes, they did discriminate against me.
24     Q   Because you met those four?

Page 141

1      A   I met these four requirements and this is
2  what they asked for.  They didn't ask for anything
3  else.
4      MR. BLAKLEY:  Okay.  That's all the questions I
5  have.
6      MS. WILLIS:  One final question.
7          FURTHER EXAMINATION
8  BY MS. WILLIS:
9      Q   Mr. Hare, is your concern that, one, you did
10 not get a response to your application?
11     A   Yeah, I didn't get anything other than the
12 way that Louise had shunned me when I first met her.
13     Q   And, two, did you feel that based on your
14 belief that you met those whatever you want to call
15 them, hiring requests, that you at least deserved an
16 interview?
17     A   Or something.  Man, something.
18     Q   Okay.  So the fact that you met what
19 ProPublica says in their hiring notice that you met
20 those requirements, you at least expected an
21 interview and/or an acknowledgment from ProPublica?
22     A   At the least.  At the least.  At the least.
23 I didn't even get that.
24     MS. WILLIS:  Okay.

Page 142

1      MR. BLAKLEY: Okay. I think we're finished.
2 Thank you for your time, Mr. Hare. I appreciate it.
3      THE COURT REPORTER: Do you want this
4 transcribed?
5      MR. BLAKLEY: Yes, please, electronic copy, that
6 would be great. I don't think we need a copy of the
7 exhibits.
8      THE COURT REPORTER: Do you want a copy?
9      MS. WILLIS: Yes, I do.
10            * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 143

1 STATE OF ILLINOIS  )
                ) ss:
2 COUNTY OF C O O K  )
3
4     The within and foregoing deposition of the
5 aforementioned witness was taken before
6 LISA A. BORDEN, C.S.R., and Notary Public, at the
7 place, date and time aforementioned.
8     There were present during the taking of the
9 deposition the previously named counsel.
10     The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the
12 questions and answers were taken down in shorthand by
13 the undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the
17 time and place hereinabove referred to.
18     The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to
20 Rules 30 (e) and 32 (d) of the Rules of Civil
21 Procedure for the United States District Court, to
22 the deponent per copy of the attached letter.
23
24

Page 144

1     The undersigned is not interested in the within
2 case, nor of kin or counsel to any of the parties.
3     Witness my official signature and seal as
4 Notary Public in and for Cook County Illinois on this
5 13th day of January, A.D. 2020.
6
7
8
9
10           _____
          LISA A. BORDEN, C.S.R.
11           License No. 084-003300
          Notary Public
12           200 West Jackson Blvd.
          Suite 600
13           Chicago, Illinois 60606
          Phone: (312) 236-8352
14
15
16
17
18
19
20
21
22
23
24

Page 145

1         C O R R E C T I O N  P A G E
2 I made the following changes for the following reasons:
3 PAGE  LINE           ERRATA SHEET
4 ____  ____      CHANGE: _____
5               REASON: _____
6 ____  ____      CHANGE: _____
7 ____  ____      REASON: _____
              CHANGE: _____
8               REASON: _____
9 ____  ____      CHANGE: _____
10 ____  ____      REASON: _____
11               CHANGE: _____
12 ____  ____      REASON: _____
13 ____  ____      CHANGE: _____
14               REASON: _____
15 ____  ____      CHANGE: _____
16 ____  ____      REASON: _____
              CHANGE: _____
17               REASON: _____
18 ____  ____      CHANGE: _____
19 ____  ____      REASON: _____
20               CHANGE: _____
21 ____  ____      REASON: _____
22
   (signed) _____ DATE _____
23         KENNETH E. HARE
24 Reporter: LISA A. BORDEN (Job No. 872422)

Page 146

```
 1                    U.S. LEGAL SUPPORT
                     200 West Jackson Blvd.
 2                        Suite 600
                     Chicago, Illinois  60606
 3

 4

                     WITNESS CERTIFICATION
 5

 6    I hereby certify that I have read the foregoing
 7   transcript of my deposition consisting of pages 1
 8   through 146, inclusive.  Subject to the changes set
 9   forth on the preceding pages, the foregoing is a true
10   and correct transcript of my deposition taken on the
11   6th day of January          .

12

13          ____ Corrections have been submitted
14          ____ No corrections have been submitted
15

16          _____
17                   KENNETH E. HARE
18

19

20   SUBSCRIBED AND SWORN TO
     before me this     day of
21            A.D. 20__.

22

23

     Notary Public
24   Reporter:  LISA A. BORDEN (Job No. 872422)
```

Page 147

```
 1                    U.S. LEGAL SUPPORT
                  Certified Shorthand Reporters
 2             200 West Jackson Blvd. - Suite 600
                  Chicago, Illinois  60606
 3

                      January 14, 2020
 4
     Ms. Jill M. Willis
 5   Law Office of Jill M. Willis
     3628 South King Drive
 6   Chicago, IL  60653
     viea email only: jillwillis.law@gmail.com
 7
               CASE:  Hare v. ProPublica
 8        DEPONENT:  Kenneth Hare
          DATE TAKEN:  January 6, 2020
 9
10   Dear Ms. Willis:
11   Enclosed is the deposition transcript you requested,
     as well as the witness signature page and errata
12   sheet(s) for the deponent to complete any changes.
     Please be sure to have the deponent list the page and
13   line number of each change. Once complete, please
     forward the completed signature page and errata sheet
14   to our office for distribution, either by mail, or by
     email to chiproduction@uslegalsupport.com.
15
     Please note that the deponent has 30 days from the
16   date of this letter for reading and signing pursuant
     to Rule 30(e) of the Federal Rules of Civil
17   Procedure.
18   Thank you for your cooperation in this matter.
19
20            Sincerely,
21            William Tolliver
              William Tolliver, Production Clerk
22
23   cc:  Counsel of Record
24
```